**UNIVERSITY OF the CUMBERLANDS,**
Appellant,

v.

**Rev. Albert M. PENNYBACKER, et al., Appellees.**

**Vernie McGaha, (Senator, in his Official Capacity as a Member of the Kentucky General Assembly), et al., Appellants,**

v.

**University of the Cumberlands, et al., Appellees.**

Nos. 2008–SC–000253–TG (2008–CA–000643), 2008–SC–000285–TG (2008–CA–000682).

Supreme Court of Kentucky.

April 22, 2010.

Mark Richard Overstreet, Stites & Harbison, PLLC, Frankfort, KY, James Dee Jordan, Guenther, Jordan & Price, PC, Nashville, TN, Kimberlee Wood Colby, Center for Law & Religious Freedom, Springfield, VA, Counsel for University of the Cumberlands.

David B. Tachau, Tachau Meek PLC, Louisville, KY Counsel for Rev. Albert M. Pennybacker, Rev. Dr. Paul D. Simmons, Jefferson County Teachers Association, Christina Gilgor, Kentucky Fairness Alliance.

Ellen M. Hesen, General Counsel, Frankfort, KY, Counsel for Steven L. Beshear, Formerly Ernie L. Fletcher, in his Official Capacity as Governor of the Commonwealth of Kentucky.

Bryan Howard Beauman, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, KY, Counsel for Vernie McGaha, Gary Tapp, Jack Westwood, Carroll Gibson, Damon Thayer, Ernie Harris Dick Roeding, Danny Ford, Joe Fischer, Mike Harmon, Tom Kerr, Marie Rader and Addia Wuch-

ner, in their Official Capacity as Members of the Kentucky General Assembly.

Mary Wheeler Ruble, Kentucky Education Association, Frankfort, KY, William Ellis Sharp, American Civil Liberties Union of Kentucky, American Civil Liberties Union Program on Freedom of Religion and Belief, Americans United for Separation of Church and State, Louisville, KY, Robert Daniel Beale, American Jewish Congress, Anti–Defamation League, McKenna, Long & Aldridge, LLP, Atlanta, GA, Jessica C. Abrahams, American Jewish Congress, Anti–Defamation League, McKenna, Long & Aldridge, LLP, Mark Alan Wohlander, The Becket Fund, Wallingford Law PSC, Lexington, KY, Lori H. Windham, The Becket Fund for Religious Liberty, Washington, DC, Counsel for Amicus Curiae.

Opinion of the Court by Justice ABRAMSON.

In the 2006 Budget Bill, the Kentucky General Assembly appropriated $10 million for the construction of a pharmacy school building on the campus of the University of the Cumberlands, a Baptist college located in Whitley County. The legislature also appropriated $1 million for a Pharmacy Scholarship Program to benefit pharmacy students "at a private four (4) year institution of higher education with a main campus located in an Appalachian Regional Commission county...." KRS 164.7901(1). In a declaratory judgment action challenging both appropriations, the Franklin Circuit Court held that the Pharmacy School appropriation violated Sections 5 and 189 of the Kentucky Constitution and the Pharmacy Scholarship Program violated Section 51. This Court granted transfer of the case from the Court of Appeals pursuant to Kentucky Rule of Civil Procedure 74.02. Following review of the record and applicable law, we affirm the circuit court's holding that the Pharmacy School appropriation violates Section 189, which prohibits public funding of "any church, sectarian or denominational school," and further find the Pharmacy Scholarship Program violates Section 59, which prohibits special legislation.

## RELEVANT FACTS

The University of the Cumberlands, Inc. (UC), formerly Cumberland College, is a private university founded by Baptists in 1887 and located in Williamsburg, Whitley County, Kentucky. UC is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools and is affiliated with both the Southern Baptist Convention and the Kentucky Baptist Convention. According to UC, it currently provides approximately 1700 students from "diverse religious backgrounds, a liberal arts education enriched with Christian values." Under a 1986 Covenant Agreement between UC and the Kentucky Baptist Convention, as well as the 2005 Restated Articles of Incorporation for UC, if the corporate entity ever dissolves all assets are to be distributed to the Kentucky Baptist Convention.

On April 11, 2006, in its biennial budget bill, the General Assembly approved $10 million in public bond financing for the construction of a pharmacy school on the UC campus. HB 380, 2006 Ky. Acts 252. The bonds are to be sold by the Kentucky Infrastructure Authority to private investors with the principal on the bonds paid from coal severance taxes levied pursuant to KRS 143.020 and the interest paid from the General Fund.

HB 380 also included a $1 million allocation from the General Fund to a Pharmacy Scholarship Program. That provision, codified at KRS 164.7901 provides in subsection (1):

It is the intent of the General Assembly to establish a scholarship program to provide eligible Kentucky students the opportunity to attend an accredited school of pharmacy at a private four (4) year institution of higher education with a main campus located in an Appalachian Regional Commission county in the Commonwealth and become certified pharmacists in the Commonwealth.

Subsection 3 provides that scholarship recipients must be Kentucky residents enrolled full-time in a Kentucky pharmacy school and must provide one year of service as a pharmacist in Kentucky for each year the scholarship is awarded. The scholarship amount is set forth in subsection (4) which provides:

The amount of the scholarship awarded to an eligible student by the authority shall be equal to the difference between:

(a) The amount charged for in-state tuition at the University of Kentucky College of Pharmacy; and

(b) The prevailing amount charged for tuition at the institution in which the student is enrolled.

After the initial funding, the "special trust fund" necessary to sustain the Scholarship Program is to be generated from coal severance tax revenues levied under KRS 143.020. KRS 164.7901(11) provides that up to 4% of the coal severance tax revenues collected annually "shall be transferred to the special trust fund ... in an amount that permits each Kentucky resident eligible" under the statute to receive a scholarship award as provided in subsection (4), *i.e.,* the difference between UK Pharmacy School tuition and the institution's tuition.

After Governor Ernie L. Fletcher declined to veto the aforementioned appropriations, Appellee Christina Gilgor filed a declaratory judgment action against the Governor on April 25, 2006 challenging both the Pharmacy School and the Pharmacy Scholarship Program appropriations as violating specific provisions of the Kentucky Constitution. Subsequently, through amended complaints, the Kentucky Fairness Alliance, the Jefferson County Teachers Association and two taxpayers, Rev. Albert M. Pennybacker and Rev. Dr. Paul D. Simmons, also became plaintiffs. The Franklin Circuit Court later allowed UC and a group of thirteen members of the General Assembly to intervene as defendants in support of the challenged legislation. For clarity, those challenging the legislation are hereafter referred to as "Plaintiffs" and those defending it are collectively referred to as "Defendants".

Twenty months after HB 380 passed, on December 10, 2007, UC and the Governor's Office for Local Development entered into a Memorandum of Understanding (MOU) designed to address some of the issues raised in the declaratory judgment action. UC committed in the MOU *inter alia* that no portion of the funds would be "used for any church, sectarian or denominational purpose" and that if the building ever ceased to be used as a pharmacy school it would revert to Whitley County.

Meanwhile, UC had moved for summary judgment in October, 2007 and Plaintiffs had filed a response and counter-motion for summary judgment in November. Following additional briefing and oral arguments, the circuit court entered its Judgment and Order on March 6, 2008 granting Plaintiffs' cross-motion for summary judgment and declaring both appropriations unconstitutional. UC and the intervening legislators filed timely appeals and this Court granted transfer of those appeals from the Court of Appeals pursuant to CR 74.02.

*ANALYSIS*

## I. The Pharmacy School Appropriation for UC Violates Section 189 of the Kentucky Constitution.

Kentucky's fourth and present Constitution, adopted in 1891, includes in Section 5 a "Right of religious freedom." In pertinent part, the provision states that "no preference shall ever be given by law to any religious sect, society or denomination; . . . ."[1] In the sections of the Constitution pertaining to "Education" the drafters addressed religious schools in Section 189 which states: "No portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by, or in aid of, any church, sectarian or denominational school." These two specific provisions along with Section 171, which provides in relevant part that "taxes shall be levied and collected for public purposes only," form the basis of Plaintiffs' challenge to the Pharmacy School appropriation. Because we find the appropriation violative of Section 189, we need not address the other constitutional infirmities they allege.[2]

### A. Section 189 Prohibits Appropriations of Public Funds to Religious Schools.

Beginning with the language of Section 189, and more specifically the closing phrase of the provision, it is apparent that UC is a "church, sectarian or denominational school." From its founding by the Mt. Zion Association of Baptists in September 1887 through its present day Covenant Agreement with the Kentucky Baptist Convention (KBC), UC has been supported by members and churches of the Baptist faith. According to the Covenant Agreement, KBC's primary purpose in supporting UC is "to advance the Kingdom of God in the area of Christian higher education. Such purpose should at all times be recognizable within the ministry of Cumberland College [now UC]." Although UC agreed in the December 2007 Memorandum of Understanding not to use any of the pharmacy building funds for "church, sectarian or denominational" purposes, this MOU cannot change the character of the institution itself. It is precisely the type of school referenced in Section 189, and clearly state funds have been "appropriated to, or [will be] used by, or in aid of" the school. Thus, our focus turns to the opening phrases of the section.

Section 189 begins with the following language: "[n]o portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes . . . ." The phrase "for educational purposes" plainly modifies "raised or levied" so the section literally focuses on the purpose for which the funds or taxes were collected. However, given Kentucky jurisprudence, Defendants have couched their primary defense of the pharmacy school in terms of whether the appropriation itself was for an educational purpose. Because

---

**1.** "No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support to any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience."

**2.** Plaintiffs also alleged the Pharmacy School appropriation violated Sections 2, 3 and 184 of the Kentucky Constitution.

this construction of the section has some basis in precedent, it is necessary to consider both the purpose for which the funds were appropriated and the purpose for which the funds were "raised or levied" in the first instance. We begin with the former construction that focuses on the purpose for which the funds will be used.

Relying on *Kentucky Building Comm. v. Effron*, 310 Ky. 355, 220 S.W.2d 836 (1949), Defendants insist the funds to construct the Pharmacy School building were appropriated for a "health and welfare purpose" rather than "educational purposes." Specifically, they maintain that the shortage of pharmacists in Kentucky generally and in the Appalachian area particularly prompted the legislature to act.[3] Assuming this legislative intent, this argument begs the question—how can an appropriation to construct a pharmacy school not entail an educational purpose? What could the construction of a building possibly accomplish in addressing the alleged shortage of pharmacists in the Commonwealth unless faculty are retained and students are then recruited and educated in a manner that will enable them to pass the requisite professional licensing examinations? The $10 million appropriation is for bricks and mortar but its ultimate purpose is to provide a venue for the education of pharmacy students.

Education was not an issue in *Effron, supra*, the case Defendants primarily rely upon. To take advantage of federal funding for the construction of public and nonprofit hospitals, the Kentucky General Assembly appropriated funds to hospitals associated with the Episcopal Church and the Roman Catholic Church. The hospitals served the health care needs of Kentuckians and, significantly, had no educational mission. This Court's predecessor found the appropriations constitutional noting "[t]he hospitals are open to the public of all creeds and faiths—and even to those who profess no certain religious belief. Religion is not taught in these hospitals nor is any one sect given preference over another." 220 S.W.2d at 838. The *Effron* Court contrasted the case before it with prior cases involving appropriations for parochial school students noting specifically that "[section] 189 of our Constitution forbids the use of any taxes levied for educational purposes from being appropriated in aid of any private, sectarian or denominational schools." *Id.*

By contrast, education was at issue in *Fannin v. Williams*, 655 S.W.2d 480 (Ky. 1983), a case in which this Court invalidated a statute that supplied textbooks to children attending nonpublic schools. In *Fannin*, this Court concluded that the funds were not being spent for "public purposes", as required by Section 171 of the Kentucky Constitution, and that because it was impossible to classify the textbooks "as anything but educational" the appropriation violated Section 189. 655 S.W.2d at 482–84. As to Section 171, the Court noted that "nonpublic schools are open to selected people in the state, as contrasted with public schools which are open to 'all people in the state' ". *Id.* at 482. The *Fannin* Court addressed the intersection of public purpose and education, acknowledging that education is definitely a public purpose but concluding that the Kentucky Constitution is unyield-

---

**3.** Plaintiffs argue that the record is void of any legislative or executive branch consideration of a shortage of pharmacists or pharmacy schools in Kentucky generally or the Appalachian region specifically prior to the passage of HB 380. While there may be merit to this point, it has no bearing on our disposition of the constitutional issues before this Court.

ing as to where public funds can be used for educational purposes.

In sum, the Kentucky Constitution contemplates that public funds shall be expended for public education. The Commonwealth is obliged to furnish every child in this state an education in the public schools, but it is constitutionally proscribed from providing aid to furnish a private education. *Pollitt v. Lewis,* 269 Ky. 680, 108 S.W.2d 671 (1937). We cannot sell the people of Kentucky a mule and call it a horse, even if we believe the public needs a mule.

Unlike the statute extending transportation to children in nonpublic schools, it is impossible to classify textbooks as anything but educational. As such the statute must meet the constitutional limitations of those sections of the Constitution covering "Education."

One can argue, quite reasonably, that this statute (and any statute) furthering education is of public benefit, whether selective or not. Unfortunately, this approach begs the question, because the Constitution establishes a public school system and limits spending money for education to spending it in public schools.

655 S.W.2d at 484. Just as the textbooks in *Fannin* were unquestionably educational, a pharmacy school is unquestionably educational. As the trial court concluded, *Fannin,* not *Effron,* is the controlling precedent and the Pharmacy School appropriation is patently "for educational purposes."

Defendants also direct this Court's attention to an earlier case involving appropriations to nonpublic schools as indicative of the propriety of allowing public funds to private schools if a public purpose is evident. In *Butler v. United Cerebral Palsy of N. Ky., Inc.,* 352 S.W.2d 203 (Ky.1961), with then-Judge, later Chief Justice, Palmore writing, the predecessor to this Court upheld a statute authorizing the payment of public funds to private institutions for the education of "exceptional children." The institutions involved in that case were schools operated by "nonsectarian charities", but the statute's use of the term "private schools" raised the spectre of violation of Section 189.

We come lastly to the question of whether the act permits public funds to be used by sectarian or denominational schools in violation of Const. § 189. It so happens that the schools involved in this lawsuit are nonsectarian charities, but the term 'private schools,' of course, admits of no such limitation. Literally it would appear to mean any school outside the common school system. However, we may properly indulge the presumption that the legislature did not intend to include schools to which the payments could not legally be made. It is not unreasonable to presume, for example, that the term was not meant to include schools not within the state, and it is equally reasonable to infer that it does not include schools that give sectarian instruction or have any denominational requirements with respect to their teachers or pupils.

352 S.W.2d at 208–09. Thus, *Butler* does not support Defendants' contention but quite squarely rejects it: appropriations to private schools can be constitutional but not if the school is a "church, sectarian or denominational school."

Defendants fare no better if we focus on the purpose for which the funds were raised. *Butler* merits closer examination because it identifies Kentucky precedent wherein the emphasis, at least in the "com-

mon school"[4] context, shifted from the purpose for which state funds were raised to the purpose for which the funds were appropriated or used. In fact, *Butler, supra,* confronted the closely related issue of the reference in Section 184 of the Kentucky Constitution to monies "raised or collected for education." That Court noted that in *Pollitt v. Lewis,* 269 Ky. 680, 108 S.W.2d 671, 672 (1937), the Court held that the restriction was on the "legislative power *to expend money* for education other than in the common schools" and not whether the funds were expressly raised for education. 352 S.W.2d at 207 (emphasis in original). Similarly, in *Talbott v. Ky. State Bd. of Education,* 244 Ky. 826, 52 S.W.2d 727 (1932), Kentucky's High Court held that "any funds raised by taxation become a part of the school fund as soon as they are appropriated for school purposes." 352 S.W.2d at 207. As *Butler* notes, however, there is dictum in at least one case to the contrary. *Hodgkin v. Bd. for Louisville & Jefferson Co. Children's Home,* 242 S.W.2d 1008 (Ky.1951) (common school funds cannot be spent outside common school system but other state funds can be so spent.) The *Butler* Court did not have to resolve this issue because the nonsectarian schools in that case were not prohibited recipients of public funds. By contrast, we must address the comparable language in Section 189 regarding funds "raised or levied for educational purposes." Kentucky constitutional history supports the conclusion that Section 189 was specifically directed at postsecondary or higher education and, further, that the

intent was to prohibit all public funding of sectarian or religious colleges.

Section 189 was adopted on March 11, 1890, during the 1890 Constitutional Convention, with virtually no discussion immediately preceding the vote. *Official Report of the Proceedings and Debates in the Convention Assembled at Frankfort on the Eighth Day of September, 1890, to Adopt, Amend or Change the Constitution of the State of Kentucky* [hereafter "*Official Report of the 1890 Convention*"] at 4606–07. However, the delegates had debated for two full days the contents of the "Education" portion of the Kentucky Constitution set forth in Sections 183–189. *Id.* at 4452–4606. There was much debate about what "common schools" encompassed and what, if any, role the state should play in providing higher education. Some delegates opposed any public support of schools with curricula that went beyond the rudiments of reading, writing and arithmetic, advocating that all higher education be left to sectarian schools or other private institutions.[5] Several delegates supported compulsory education for younger children but mandatory attendance at common schools did not find its way into the Kentucky Constitution. The wide-ranging debates addressed *inter alia* teacher education, parity among schools across the Commonwealth, the education of black schoolchildren, the length of the school year, nepotism in school hiring, and state financing of education at all levels.

To gain insight into the meaning of Section 189, it is necessary to understand Section 184, the provision establishing the

---

4. A "common school" is now defined in KRS 158.030 as "an elementary or secondary school of the state supported in whole or in part by public taxation."

5. Delegate L.W. Lassing of Boone County passionately decried state involvement in higher education noting that the farmers in agrarian Kentucky did not "need to be philosophers to carry out their mission in life." *Official Report of the 1890 Convention* at 4506. He also advocated a "rudimental common school education" and threatened to "immediately emigrate" from Kentucky if compulsory education were ever adopted. *Id.* at 4507.

"common school" fund which also was adopted on March 11, 1890. *Official Report of the 1890 Convention* at 4598–99. Section 184 identified the then existing bonds and stocks which would comprise the "common school" fund along with interest and dividends therefrom as well as "any sum which may be produced by taxation or otherwise for purposes of common school education." The section ends as follows:

> No sum shall be raised or collected for education other than in common schools until the question of taxation is submitted to the legal voters, and the majority of the votes cast at said election shall be in favor of such taxation: Provided, The tax now imposed for educational purposes, and for the endowment and maintenance of the Agricultural and Mechanical College, shall remain until changed by law.

The Agricultural and Mechanical College referred to in the closing sentence, now the University of Kentucky, was at the center of the fierce debate about state support of higher education. Several delegates, but most notably Judge William M. Beckner of Winchester in Clark County, the primary author of Section 189, urged continued state support of this fledgling institution for which the federal government had made an initial grant of 330,000 acres of land. Kentucky had sold off much of the land grant to private purchasers and had done little beyond enacting a meager tax to support the A & M College.[6] Judge Beckner noted that sectarian influences were seeking to undermine continued support by eliminating the A & M College tax, leaving the future of higher education in the Commonwealth to those institutions founded or controlled by churches and religious groups.[7] Judge Beckner was successful in turning back those who wished to remove the Commonwealth from the business of higher education. In lengthy remarks regarding his respect for religiously-affiliated colleges (which he and his children had attended), he noted bluntly: "The location and endowment of these institutions is a matter that concerns the church." *Official Report of the 1890 Convention* at 4543. In the end, Section 184 of the Kentucky Constitution preserved both the integrity of the common school fund and the taxes[8] used to support it as well as the separate tax for the A & M College.

Thus when the delegates to the 1890 Constitutional Convention adopted Section 189 the reference to "educational purposes" included not only primary and secondary education but most assuredly postsecondary education. Indeed, the ban on

---

6. "In 1880 the General Assembly, realizing that the State had done practically nothing for the institution, that it had wasted its endowment in making such a hasty sale of its lands, that the people were interested in having a school directly under State control, nonsectarian in character, admitting to its halls both males and females, and encouraging the young of the humbler walks of life to seek for higher education on more practical lines than they could in the ordinary college, voted for its use an annual tax of one-half of one per cent on each $100 of value of the property in the State liable to taxation for State revenue. This produces an additional income of about $24,000 per year, and, added to the interest received on the fund arising from the sale of lands, makes a foundation for an institution worthy of Kentucky." *Official Report of the 1890 Convention* at 4473. (Remarks of Judge William H. Beckner).

7. See Judge Beckner's remarks *infra* at p. 682.

8. One of Judge Beckner's allies, Delegate H.H. Smith of Hardin County, noted at one point that by 1890 "the school tax is equal to one-half of the amount of taxes collected by the Commonwealth." *Official Report of the 1890 Convention* at 4513.

appropriations to "church, sectarian and denominational schools" was most particularly directed at those then-existing colleges and universities operated by various religious organizations. In fact, all of the references by constitutional convention delegates to specific sectarian or denominational schools arose in the context of the debate over higher education, not primary and secondary schools.[9] Equally significant, the "fund[s] or tax[es]" that were not to be appropriated to religious schools were all of the monies then being raised or levied for educational purposes.

The Commonwealth's commitment to public institutions of higher learning has grown dramatically over the ensuing 120 years[10] but there are no longer specific taxes "raised or levied" for the University of Kentucky or its sister state universities. In fact, KRS 47.010 provides, with a few exceptions regarding primarily taxes directed to the state road fund, "all state revenue shall be credited to the general fund." In KRS 48.010(13)(a) for "Budget" purposes, the "General Fund" is "all moneys, not otherwise restricted, available for the general operations of state government." KRS 48.010(13)(f) defines a "Restricted Fund" as "budget unit receipts restricted as to purpose by statute." Presently, postsecondary education in Kentucky is funded primarily by the General Fund and the institutions' own receipts such as fees and tuition, i.e., Restricted Funds. In the 2008–2009 Operating Budget, for example, Postsecondary Education received a total of $5,239,769,000 consisting of some monies from Federal Funds and a special General Fund created by the Tobacco Settlement but primarily appropri-

ations (approximately $4.5 billion) from the aforementioned General Fund and Restricted Funds. See Michie's *Kentucky Revised Statutes*, 2008 Cumulative Supp. at Appendix A, State/Executive Branch Budget ("2008 State/Executive Branch Budget") at p. 88.

None of these funds (or for that matter any of the approximately $3.85 billion in General Fund appropriations allocated to the Department of Education for primary and secondary education) were taxes specifically "raised or levied" for educational purposes. 2008 State/Executive Branch Budget at p. 54. Education is now a firmly entrenched part of the "general operations of state government" and public educational institutions rely on revenues from the General Fund. Notably, the debt service for bonds issued for Eastern Kentucky University, Kentucky State University, the Universities of Louisville and Kentucky, Murray State University, Western Kentucky University, and all other Kentucky public universities is provided by General Fund monies. *Id.* at pp. 84–87. Thus, Kentucky public universities rely on the same source of debt service for their bonds, i.e., the General Fund, as UC would rely on for the Pharmacy School bonds. In short, while the tax structure in late nineteenth century Kentucky may have involved taxes levied or funds specifically raised for the A & M College, twenty-first century Kentucky tax law does not draw such distinctions. Instead, all revenue raised or taxes levied by the Commonwealth may fairly be said to have been collected for state government purposes and one leading purpose is indisputably public education at the primary, secondary

9. Centre College figured prominently in the debates but there were also references to Georgetown College, the Wesleyan College at Winchester and other religiously affiliated colleges.

10. See generally KRS Chapter 164.

and postsecondary levels. Under these circumstances, Section 189 is properly read to prohibit appropriation of *any* public funds to religious schools.

Just as General Fund monies cannot be appropriated to pay the interest on the Pharmacy School bonds without running afoul of Section 189 of the Kentucky Constitution, the same conclusion must be reached as to the coal severance tax revenues used to repay the principal on those bonds. KRS 143.020 imposes the so-called coal severance tax on the "privilege of severing and processing coal." Pursuant to KRS 143.090, a portion of the tax revenues is designated for the road fund and a portion for the Office of Energy Policy (OEP). All receipts in excess of the amounts statutorily required for the road fund and OEP are required to be deposited "to the credit of the general fund." KRS 143.090(4). Thus, the coal severance tax surplus monies that would be used to repay the principal on the bonds for the Pharmacy School (and to create the Pharmacy Scholarship Program as discussed *infra* ) are in fact General Fund monies or, at the very least, monies that were required to be deposited to the General Fund for state government purposes. Simply put, designating the coal severance tax as the primary source of the bond funding does not avoid the Pharmacy School appropriation's conflict with Section 189. It is all public money which cannot be constitutionally directed to UC.

In sum, the Pharmacy School appropriation clearly violates Section 189 of the Kentucky Constitution because it is an allocation of public funds for educational purposes to a "church, sectarian or denominational school." Whether the focus is on the purpose for which the funds were appropriated (pharmacy education) or the purpose for which the funds were "raised or levied" (the General Fund which supports the operations of state government including public education), the result is the same. The Pharmacy School appropriation is unconstitutional and that portion of HB 380 cannot be implemented.

**B. Section 189 Does Not Offend the First Amendment of the U.S. Constitution.**

■ Taking a different tack, Defendants also challenge any construction of Section 189 that would prohibit funding of the Pharmacy School on the grounds that such construction would violate the First Amendment of the United States Constitution. Specifically, they contend that it would violate the Free Exercise Clause of that amendment as well as the Free Speech Clause. In fact, Section 189, as construed today and over the past 120 years, does not violate the First Amendment of our nation's Constitution in any discernible way.

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." [11] As the United States Supreme Court noted in *Locke v. Davey,* 540 U.S. 712, 718, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), the two clauses in that amendment, the Establishment Clause and the Free Exercise Clause, "are frequently in tension." *Locke* involved a challenge by a college student, Davey, who was not allowed to use a state-funded scholarship if he pursued a degree in devotional theology. Relevant language in Article I, section 11 of the Washington Constitution included the following: "No public money or property shall be approp-

---

11. The same restrictions have been held to apply to state legislatures by virtue of the Fourteenth Amendment to the United States Constitution. *Cantwell v. State of Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

riated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment." In *Locke*, the U.S. Supreme Court held the Free Exercise Clause did not prohibit the State of Washington denying scholarship funds to theology degree students on state constitutional grounds. Noting the right of the states to erect a stronger wall between church and state than even that required by the U.S. Constitution, Justice Rehnquist wrote:

> Even though the differently worded Washington Constitution draws a more stringent line than that drawn by the United States Constitution, the interest it seeks to further is scarcely novel. In fact, we can think of few areas in which a State's antiestablishment interests come more into play. Since the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an "established" religion.

> \* \* \* \* \* \*

> Most States that sought to avoid an establishment of religion around the time of the founding placed in their constitutions formal prohibitions against using tax funds to support the ministry.

540 U.S. at 722–23, 124 S.Ct. 1307 (citations and footnotes omitted). (One of the state constitutions cited was the 1792 Kentucky Constitution which contained such a provision in Art. XII, Section 3.) In upholding application of the prohibited spending language in the Washington Constitution, the Court specifically noted "Washington has been solicitous in ensuring that its constitution is not hostile toward religion." *Id.* at 724, n. 8, 124 S.Ct. 1307.

Just as there are strong state "antiestablishment interests" in formal prohibitions on using tax funds to support the ministry there are strong state antiestablishment interests in prohibitions on the support of religious establishments such as the "church, sectarian or denominational schools" referenced in Section 189 of our Constitution. *Locke v. Davey* firmly supports our conclusion that the Kentucky Constitution does not contravene the Free Exercise Clause when it prohibits appropriations of public tax monies to religious schools. Moreover, it bears noting that Kentucky constitutional law, like Washington's, has not been hostile toward religion. Indeed, *Effron, supra,* reflects the Commonwealth's recognition of the constitutionality of funding religiously-affiliated hospitals where those institutions will provide needed public health services to all, regardless of their religious beliefs or lack thereof, and will not engage in any form of education. The drafters of the Kentucky Constitution drew the line, however, at funds which support religious schools, an inevitable consequence of the Pharmacy School appropriation which would add a $10 million building to UC's campus and allow it to expand its student body. As in *Locke v. Davey,* any tension between the Establishment Clause and the Free Exercise Clause in this case must be resolved in favor of the state's legitimate and fully constitutional antiestablishment concerns.

■ Appellants also maintain that construing Section 189 as prohibiting the Pharmacy School appropriation constitutes "viewpoint discrimination" in violation of the Free Speech Clause of the First Amendment. This same argument was roundly rejected in *Locke v. Davey:*

> Davey contends that the Promise Scholarship Program is an unconstitutional viewpoint restriction on speech. But the Promise Scholarship Program is not a forum for speech. The purpose of the Promise Scholarship Program is to assist students from low- and middle-in-

come families with the cost of postsecondary education, not to " 'encourage a diversity of views from private speakers.' " Our cases dealing with speech forums are simply inapplicable.

540 U.S. at 720 n. 3, 124 S.Ct. 1307 (citations omitted). Similarly, there is no speech forum at issue in this case where Defendants allege discrimination in the expenditure of public funds for education. More recently, in *Pleasant Grove City, Utah v. Summum*, —— U.S. ——, 129 S.Ct. 1125, 1137, 172 L.Ed.2d 853 (2009), a case involving the erection of monuments with religious messages in a city-owned park, the court noted "[t]he forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of *public speakers* without defeating the essential function of the land or the program." (emphasis supplied). Citing *United States v. American Library Association, Inc.*, 539 U.S. 194, 205, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003), a case holding that internet access from computers in public libraries was not a public forum, the Court in *Pleasant Grove* said succinctly "public forum principles ... are out of place in the context of this case." 129 S.Ct. at 1137. The same can be said here, *albeit* for different reasons. There is no unconstitutional viewpoint restriction on speech simply because a state constitution prohibits appropriations of public funds to religious schools.

### C. Section 189 is Not an Anti–Catholic Blaine Amendment and Does Not Violate the Equal Protection Clause or the Free Exercise Clause.

■ Finally, Section 189 is assailed as Kentucky's own "Blaine Amendment" borne of the rampant anti-Catholicism that affected the country in the latter-half of the 19th century. Based on this premise, Defendants and amicus curiae, The Becket Fund for Religious Liberty, contend Section 189 violates the Equal Protection Clause and Free Exercise Clause of the U.S. Constitution. We reject their premise and thus the conclusion.

As noted in *Mitchell v. Helms*, 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), the U.S. Congress considered, and nearly passed in the 1870's, the Blaine Amendment, a proposed amendment to the United States Constitution which would have expressly banned any aid to sectarian institutions. The amendment "arose at a time of pervasive hostility to the Catholic church and to Catholics in general...." *Id.* While Kentucky, regrettably, was not immune to this virulent sentiment, as evidenced most notably by the Bloody Monday riots in Louisville on August 6, 1855,[12] there is no basis for labeling Section 189 a Blaine Amendment in light of the Official Report of the 1890 Convention. None of the allegedly telling statements cited, including a quote from Andrew Carnegie and a reference to Martin Luther's support of public schools, is supportive of this

---

12. As noted in *The Kentucky Encyclopedia* published by the University Press of Kentucky, the Know–Nothing party, founded in the mid–1800s, rose to power in Kentucky on a strong anti-Irish and anti-German immigrant platform which included obvious anti-Catholic hostility. August 6, 1855 was an Election Day that resulted in the deaths of twenty-two people in Louisville, mostly Irish or German Catholic immigrants, who were the victims of a vicious mob. The city was "chastened" by the violence and although the Know–Nothing slate swept Louisville and Jefferson County that day, the party rapidly fell by the wayside. By 1857, the Know–Nothing party headquarters on Jefferson Street had been turned into a German theatre. The Civil War washed "the last vestiges of the Know–Nothing phenomenon from Louisville and Jefferson County." *www.kyenc.org* at "Bloody Monday."

argument.[13] By contrast the only reference to the Catholic faith came from Judge Beckner, the author of Section 189, which was an amendment to the initial report rendered by the Committee on Education. Recognizing the importance of religious colleges but insisting on the Commonwealth's obligation to provide non-denominational higher education, he stated:

> The denominational colleges have done great work, and have turned out great men. That will not be denied. They are usually patronized by those who entertain the peculiar views they represent. A Presbyterian prefers to have his boy go to a Presbyterian College. The Methodist prefers to have his go to a Methodist College, and the Catholic prefers to have his boy go to a Catholic College. That is a matter of preference, and the denominational colleges are founded for the benefit of those who hold to these respective views; but there is a large class who prefer not to have their boys educated at a denominational college. Then there are many of those who prefer not to have their children brought up at the particular place where the college may be located, or to subject them to the particular views maintained in other respects by those in charge of that college. They may not hold to something that the college represents, and they do not choose to send their children to it, but whether that be so or not, it is the duty of the State to furnish to its children facilities for high education.... What I have criticized was not the education received at the [sectarian] colleges, nor the fact that church

people maintain these colleges ... what I do object to is, that any of these officers should come here and attempt to destroy another seat of learning in the State ... to destroy competition....

*Official Report of the 1890 Convention* at 4544–4545. Immediately prior, Judge Beckner had noted that he himself had attended a denominational college, had sent his children to such schools and had supported the religious colleges of his own Presbyterian denomination and other denominations but, again, as he bluntly put it, "The location and endowment of these institutions is a matter that concerns the church." Having reviewed the 1890 Constitutional Debates, we conclude that Section 189 was clearly borne of the framers desire to avoid state support of *all* religious institutions' schools not of any animosity toward Catholics or any other specific religion.

In summary, the UC Pharmacy School appropriation violates Section 189 of the Kentucky Constitution. If Kentucky needs to expand the opportunities for pharmacy school education within the Commonwealth, the Kentucky General Assembly may most certainly address that pressing public need but not by appropriating public funds to an educational institution that is religiously affiliated.

## II. The Pharmacy Scholarship Program is Special Legislation that Contravenes Section 59 of the Kentucky Constitution.

 While the Pharmacy School provision in HB 380 was an appropriation di-

---

**13.** The "offending" statement from Martin Luther followed a quote wherein Luther stated that education was "not only the duty of the parents, but also of the State." Judge Beckner then said "The apostle of an open Bible was the first prophet of a State school." *Official Report of the 1890 Convention* at 4460. Shortly thereafter Becker quoted An-

drew Carnegie as follows: "The public school ... is the mill into whose hopper may be poured Germans, Irishmen, Italians, Englishmen, Scandinavians, or the representatives of any other race, and yet may be relied on to turn out Americans, patriotic in purpose and intelligent in their devotion to our institutions." *Id.* at 4461.

rectly to UC, the Pharmacy Scholarship Program codified at KRS 164.7901 provides scholarship monies to individual students who then direct their scholarship awards to the pharmacy school they are attending. However, the statute can only be read as funding scholarships for students attending the planned UC Pharmacy School.[14] As such, it is special legislation in contravention of Section 59 of the Kentucky Constitution.[15]

Subsection (1) of KRS 164.7901 specifically notes the General Assembly's intent "to establish a scholarship program to provide eligible Kentucky students the opportunity to attend an accredited school of pharmacy at a private four (4) year institution of higher education with a main campus located in an Appalachian Regional Commission county in the Commonwealth...." No party to this litigation has questioned that the sole institution which would fit that description is UC, providing the Pharmacy School is built. Nevertheless, Defendants insist that this Court should look past the legislative intent stated boldly in subsection (1) and focus instead on the scholarship eligibility criteria stated in subsection (3). That subsection provides that scholarships are available to individuals who (a) are Kentucky residents (provided they are also United States citizens); (b) are enrolled or accepted to a full-time pharmacy program in the Commonwealth; (c) will serve one year as a pharmacist in Kentucky for each year

scholarship money is received; and (d) sign a promissory note to repay the scholarship award if they fail to render the requisite service. In their brief, Defendants suggest that the scholarship money could be directed to the UK College of Pharmacy if a recipient so desired. However, a full reading of the statute itself refutes that scenario. Subsection (4), quoted previously, defines the scholarship amount as the difference between in-state tuition at the UK College of Pharmacy and the prevailing tuition amount at the institution the scholarship student attends. Obviously, this scholarship award provision is premised on the student attending some pharmacy school other than the UK College of Pharmacy. While subsection (3) standing alone might suggest a UK pharmacy student could qualify for the Program, the scholarship award itself in subsection (4) is meaningless for such a student. There is no construction of that subsection which would produce a scholarship award to a Kentucky resident attending the UK College of Pharmacy.

In any event, this Court cannot overlook the clear import of KRS 164.7901(1) which plainly states the General Assembly's intent in enacting the Pharmacy Scholarship Program. Simply put, we are not free to ignore portions of statutes that are inconvenient to a particular litigant's position. Indeed, "the legislative intention apparent from the whole enactment must be carried into effect," *Milner*

---

**14.** We recognize that the unconstitutionality of the Pharmacy School appropriation may well render moot the constitutional challenge to the Pharmacy Scholarship Program. In the event private funds could be secured to construct the UC Pharmacy School, however, the issue is still viable.

**15.** The trial court acknowledged that the Pharmacy Scholarship Program would be special legislation if KRS 164.7901(1) were read as a restriction on who could receive

scholarship funds. That court then proceeded to conclude that the subsection was "advisory only" and to find the statute unconstitutional under Section 51, a provision regarding the title of legislation and the revision and reenactment of statutes. We do not deem KRS 164.7901(1) to be advisory but rather an integral part of the statute. Finding the statute unconstitutional a special legislation under Section 59, we do not reach the Section 51 issues addressed by the trial court.

*v. Gibson,* 249 Ky. 594, 61 S.W.2d 273, 277 (1933), and "all parts of the statute must be given equal effect so that no part of the statute will become meaningless or ineffectual." *Lewis v. Jackson Energy Co-op. Corp.,* 189 S.W.3d 87, 92 (Ky.2005). Applying these binding statutory construction principles, subsection (1) must be considered in assessing KRS 164.7901 and the inescapable conclusion is that the Pharmacy Scholarship Program was intended only for students attending the anticipated UC Pharmacy School. As such, it is special legislation which violates the Kentucky Constitution.

Before turning to Section 59, it is important to note that the dissent's suggestion that the express legislative intent set forth in subsection (1) of the statute can be disregarded as a "preamble" is not supported by the legislation itself or our fundamental principles of statutory construction. First, in Part XXIV of HB 380, 2006 Ky. Acts 252, entitled "Pharmacy Scholarship Program", there is an actual preamble and it reads: "Notwithstanding KRS 48.310, the following statute is created to read as follows and shall have permanent effect, subject to future actions of the General Assembly". This preamble, which does not become part of the statute itself, is followed by the thirteen subsections that became the enacted statute now known as KRS 164.7901. Thus, it is inaccurate to characterize subsection (1) as a "preamble": it is an integral part of the statute, passed along with the other twelve subsections. Second, recently in *Toy v. Coca Cola Enterprises,* 274 S.W.3d 433 (Ky. 2008), this Court unanimously stated that "[t]he essence of statutory construction is to determine and effectuate the legislative intent." *Id.* at 434 (citing *Hale v. Combs,* 30 S.W.3d 146, 151 (Ky.2000) and *City of Louisville v. Helman,* 253 S.W.2d 598, 600 (Ky.1952)). Because our first guiding

principle in statutory construction is to ascertain and effectuate legislative intent, there is no legal basis for excising subsection (1), wherein the General Assembly expressly stated its intent in establishing the Scholarship Program. None of the cases cited by the dissent endorse excising or ignoring an express statement of legislative intent and, under controlling Kentucky law, we are not at liberty to do so. Third, assuming *arguendo* we could strike an express statement of legislative intent, the justification for doing so under KRS 446.090—to salvage the remaining parts of KRS 164.7901—requires that the remaining parts of the statute are not "so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part...." When the legislature has stated its express intent in enacting a statute, however, one cannot possibly say that the remainder of the statute is not "essentially and inseparably connected with and dependent upon" the legislature's very intent in passing the statute. Subsection (1) is the very reason for KRS 164.7901, the Pharmacy Scholarship Program's existence. We know that because the General Assembly told us so in subsection (1). Finally, it was unnecessary for the legislature to repeat "an accredited school of pharmacy at a private four (4) year institution of higher education with a main campus located in an Appalachian Regional Commission county in the Commonwealth" every time it subsequently referred to the qualifying pharmacy school. Statutes, as noted in *Lewis,* 189 S.W.3d at 92, must be construed to give meaning to all parts "so that no part of the statute will become meaningless or ineffectual." Thus, the reference in KRS 164.7901(2) to "an institution in the Commonwealth" does not change or undermine the legislative intent expressed

in the first subsection, rather that subsequent provision is simply to be construed consistently with subsection (1).

 Section 59 of our Constitution provides that "where a general law can be made applicable, no special law shall be enacted." In *Kentucky Harlan Coal Co. v. Holmes,* 872 S.W.2d 446, 452 (1994) this Court explained the primary purpose of this provision is to "prevent special privileges, favoritism and discrimination and to assure equality under the law." As we noted in *Yeoman v. Commonwealth,* 983 S.W.2d 459, 466 (Ky.1998), the test for special legislation was formulated by this Court in *Schoo v. Rose,* 270 S.W.2d 940 (Ky.1954). "In order for legislation to be permissible under Section 59 of the Kentucky Constitution: '(1) it must apply equally to all in a class and (2) there must be distinctive and natural reasons inducing and supporting the classification.'" 983 S.W.2d at 466.

The class addressed in KRS 164.7901 is that class of students "who are enrolled or accepted for enrollment" in a Kentucky pharmacy school and who will serve in Kentucky. A shortage of pharmacists in the Commonwealth could well provide the requisite "distinctive and natural" reasons, *Schoo,* for classifying these particular students separately for purposes of state-funded scholarship assistance. KRS 164.7901's constitutional vulnerability, however, is the first part of the *Schoo* test—the requirement that the legislation apply equally to all in the class. In restricting scholarships to those attending a specific pharmacy school (and notably one which would have higher tuition than the public UK College of Pharmacy given the award contemplated in subsection (4)), the General Assembly failed to treat equally all members of the pharmacy student class. Only those pharmacy students enrolled or accepted for enrollment at the planned UC Pharmacy School could take advantage of this lucrative scholarship program. This is precisely the type of special privilege and favoritism that Section 59 condemns. Thus, however well-intentioned the Pharmacy Scholarship Program legislation may have been, as written KRS 164.7901 is unconstitutional and cannot be implemented.

## CONCLUSION

The Pharmacy School appropriation violates Section 189 of the Kentucky Constitution and the Pharmacy Scholarship Program violates Section 59. On those grounds, we affirm the trial court's judgment in favor of Plaintiffs.

MINTON, C.J.; CUNNINGHAM, NOBLE, and SCHRODER, JJ., concur.

CUNNINGHAM, J., concurs by separate opinion in which SCOTT, J., joins.

SCOTT, J., concurs in part and dissents in part by separate opinion in which VENTERS, J., joins.

CUNNINGHAM, Justice, concurring.

I write to concur with the excellent work of Justice Abramson, mindful that my writing can neither add to nor improve upon her well-written opinion.

Our majority opinion today deals primarily with the spending provision of Section 189 of our state constitution. But that provision is seeded in a religious context. That is why the trial court also based its findings on the guarantee of religious freedom in Section 5 of the Kentucky Constitution. The overarching principle guiding our enforcement of these constitutional directives is that of separation of church and state.

Therefore, I deem it needful for me to write in an attempt to dispel any abiding notion that courts, such as this one, in

marking clearly the divide between church and state, are taking a legalistic swipe at religion.

Nothing could be further from the truth. Decisions like that endorsed by our majority here today have paved the way for religion to grow and prosper in this land of the free.

The history of religious freedom in this country can trace its steps to the embryonic days of our Republic.

It is not myth to believe that many of the original founders of our country came here seeking freedom from religious persecution. It is myth to believe that they always found it when they got here. Many of them, after weathering the tumultuous dangers of the trans-Atlantic crossing, faced governmental interference into their beliefs. The original colonial governments demanded that the early settlers support a state-sponsored religion. Virginia, for instance, originally taxed all households to support the Anglican Church, just as had been required in England.

In fact, many of the early colonies established government-run churches a great deal like the European countries from which believers had fled. Southern colonies named the Anglican Church (The Church of England) as the state church.

While the Puritans complained of the Anglican control, they did not afford, religious freedoms to others. Consequently, many of the colonies of New England compelled their citizens to attend the local Puritan or Congregational Church. Dissent was stifled. Non–Puritan Christians, such as Catholics, and Quakers were sometimes fined, imprisoned, whipped and even banished.

The dissatisfaction of this type of intolerance planted the seeds for future reforms culminating in the First Amendment of our U.S. Constitution.

But Roger Williams would not stand for it.

After being banished from England, he was again banished from Massachusetts in 1635. He promptly founded Rhode Island, which quickly established the separation of church and state. There, he also established the First Baptist Church in America which is still in existence on the campus of Brown University. Needless to say, Catholics, Jews, Baptists and others fled to this haven of religious freedom. It became both a refuge and example for future steps in this direction. Only fifty years later, William Perm did the same thing in establishing Pennsylvania. By the time of our Revolutionary War, that state had become home to over four hundred religious groups. The underlying force for these movements was separating government from religion. Such a notion was so popular that these colonies grew in leaps and bounds and showed to the world how peoples of divergent religious beliefs could live together in harmony. At the time of the Revolutionary War, there were still nine colonies with state-run churches. This unpopular yoke of spiritual repression was joyously thrown off by the successful rebellion which forged this country.

There has been no country since recorded time where religion has thrived and flourished as over the last 230 years in the United States of America. In addition to the Catholic Church, which claims over one-fourth of Americans as members, there are over 71 different Protestant churches self-reporting to the United States Census Bureau. These do not include the thousands of unaffiliated churches hidden in the nooks and crannies of our country, including the cinder block, "Nothing Fancy Holiness Church," in a west Kentucky community. That is not to mention the sizable number of the Jewish

faith, as well as Hindus, Muslims, Buddhists, and others.

All these creeds and groups, large or small, from the cinder block hovels of rural America to the gothic spires of Saint Patrick's Cathedral in Manhattan, make their own equal claim to ecclesiastical purity.

Where else in the world is one able to find such a kaleidoscope of faith?

This is because of our fundamental belief as a nation that religion and state should co-exist in harmony with each other, but along distinct and separate tracks. Most importantly, under our constitutional framework, religion is allowed to breathe free of the enervating drag of government regulation, taxation and control.

By all accounts, the University of the Cumberlands is nothing short of remarkable. What began as a small, struggling, Baptist liberal arts college in the mountains has evolved into a thriving, beautiful campus and university.

Unfortunately, in this country, operating a major college sometimes requires more money than can be given by its benefactors. That is why many strictly religious schools have transformed into secular institutions. Brown University in Rhode Island; George Washington University in Washington, D.C.; University of Richmond in Virginia; Wake Forest University in North Carolina; Mercer University in Georgia; Stetson University in Florida; Belmont University in Tennessee; and Georgetown College in Kentucky are some examples of these. Many would say that we are fortunate that some religious schools like the University of the Cumberlands have stayed the course and have remained strictly religious schools, free from state entanglements. Many would say it should stay that way. Those many will support our decision here today.

There is a grand irony in this case which involves a Baptist supported college seeking a state supported pharmacy school.

Baptists come from a long line of "Separatists." They fled England to Holland and later to America to escape entanglements with the state.

The real battle for religious liberty and separation of church and state was in Virginia, the Carolinas, and Georgia. In those colonies, Baptist preachers were jailed for preaching. It is well-documented that Madison was influenced by the Baptists in drawing up the Bill of Rights—more especially the First Amendment's separation of church and state. The Baptist vote was pivotal in the adoption of our Constitution and its subsequent Amendments.

Separation of church and state has been an axiom of the Baptists for centuries—The Philadelphia Confession of Faith (1689 & 1742); The New Hampshire Baptist Confession of Faith (1833); and The Baptist Faith and Message (1925).

John Leland was a highly influential Baptist preacher and friend of both Thomas Jefferson and James Madison. Over several early decades of our Democracy, he preached fervently and eloquently for the separation of church and state. "The work of the legislature," he declared, "is to make laws for the security of life, liberty and property, and leave religion to the consciences of individuals."

The early Baptists, at least, believed that church and state are mutually beneficial only if they remain distinct and separate in the normal affairs of life. These deeply rooted tenets could provide the guideposts for our decision here today. They hold that the state provides a favorable atmosphere in which the church can do its work. And the churches, in turn, should produce, through their respective

creeds, citizens who will contribute to a stable social order. At the same time, church and state are mutually exclusive.

Neither should seek to control the other or use it in filling its peculiar role.

Neither should propose to tell the other how to discharge its responsibility.

The church should not seek to use the state for its purposes.

The state should not commandeer the church for political ends.

The state should not favor one "religion" above another.

Taxes should not be levied against property used for religious purposes.

The church should not receive tax funds for use in discharging its educational, healing, or spiritual responsibilities.

This constitutional division of church and state has acted to save religious organizations from self-destructing from their own zeal. Religious schools are free to exist and function in accordance to their own moral and theological dogma. This includes the right to restrict their memberships and their campus academia to strict, sometimes even unpopular, religious views and activities. When state involvement and support begins to be part of their operations, this freedom goes away. We do not know what twists and turns pharmaceutical science may take over the next fifty years. It is not inconceivable that it may infringe upon the religious and moral beliefs of some—maybe even Baptists. If public funding and control creeps onto the campuses of religious colleges, the aims of those religious schools may be terminally compromised.

That is not to say that religion has not blended into our national government's creation and experience. Marbled within the granite of this great republic is traditional reverence and respect to a Supreme Being in whatever form or name we reverently allude to this higher power. Religion, in some form, is as much a part of this country and its rich heritage as the towering pines of the northeast or the blooming magnolias of the south.

This religious faith has been woven so intricately into the whole cloth of the rich American experience that it cannot be removed without unraveling and disintegrating the rich fabric of American life.

By the very definition of our beginning, and through the arduous pilgrimage of us as a people, a certain level of religiosity legitimately exists in our public institutions and symbols. This veil between religion and government in this country is, as the late University of Kentucky law professor Paul Oberst suggested, "a homogeneous wall." Homogenization, in dairy terms, is an intricate blending of the whey and the cream into an inseparable whole. So, in terms of a "homogeneous wall" of separation of church, the idea is that within this broad line which separates the two, there is an amalgamation where the spirit of religion co-exists with statecraft and will be given profound deference. "In God We Trust," referencing a higher deity engraved upon coins, public buildings and images, as well as like words in songs, prose, and our Pledge of Allegiance, "Under God," are some of these examples. Even some of our cherished national holidays, such as Thanksgiving and Christmas, are religious holidays.

But state sponsorship and support of religious schools is outside of the pale and crosses the line of this great divide.

No one takes issue with the admirable aim of the University of the Cumberlands in wishing to educate pharmacists for the southeastern part of our state. But from a political and practical standpoint, allowing public funding to flow across religious lines

would create more competition between light houses than already exists today between our state and regional colleges and universities. It would provide fuel for religious wars of sorts between competing and varying religious sects and denominations. If a pharmacy school at the University of the Cumberlands, why not a veterinary school on campus at Catholic Brescia College in Owensboro?

It would appear that our religious institutions have a daunting enough task, if it is to maintain spiritual sustenance and nurturing in a bewildered and fearful world, than to go head to head with public schools for the sticks and stones of campus buildings. Such struggles would dilute the intensity of their cause and drain much needed energy and resources from their critical mission.

The poet, George Greenleaf Whittier, caught the sentiment of many in his time, as well as today: "The Lord is God! He needeth not the poor device of man." It can readily be added, "Nor the help of the state." To say that government or courts affect the whereabouts of the Almighty, such as "putting God in schools" or "taking God out of schools," is not only silly, but borders on sacrilege. Such a notion banners the lack of faith, rather than the essence of faith.

This wholesome and blessed balance between church and state can only be maintained through our courts. These grand constitutional commandments speak not only to the genius and wisdom of our forefathers, but also to their astounding reverence for the soul.

Our humble decision here today is one small ripple enveloped in the marching billows of the ages.

SCOTT, J., joins.

SCOTT, Justice, concurring in part and dissenting in part.

Although I concur with the majority opinion and join Justice Cunningham's concurring opinion as to why, historically, an appropriation to one particular college affiliated with one particular denomination—among the many in America—violates Section 189 of the Kentucky Constitution, I must respectfully dissent from the majority's opinion that the Pharmacy Scholarship Program is special legislation and therefore in contravention of Section 59 of the Kentucky Constitution. In so doing, I must note my agreement with Justice Venters that eastern and southeastern Kentucky are geographically under-served by our state university system. To quote a comment by Justice Venters:

Nearly 40% of Kentucky's land area, and about 25% of the state population, lies to the south and east of the line extending across the map of Kentucky from the Ohio River through Morehead State University to Eastern Kentucky University at Richmond, and from there through Western Kentucky University in Bowling Green to the Tennessee border, yet it is home to not one of this state's eight public universities.

House Bill 380 included a three-part legislative plan for addressing the pharmacist shortage in Kentucky.[16] The first part appropriated almost $80,000,000 to the University of Kentucky for the construc-

---

16. "The fact remains: Kentucky has a shortage of pharmacists, particularly in Southeastern Kentucky." Quote from former-Governor Ernie Fletcher, April 24, 2006. "We face a tremendous shortage of licensed pharmacists across the Commonwealth, and therefore

KPhA [Kentucky Pharmacists' Association] encourages expansion of pharmacy training slots in Kentucky as long as the need exists." Extract from Kentucky Pharmacists' Association public statement in regards to pharmacy provisions in H.B. 380.

tion of a biological/pharmaceutical complex. It was envisioned that this new funding would assist the University of Kentucky College of Pharmacy in doubling its enrollment. The second part was the $10,000,000 appropriation for a new pharmacy school building at the University of the Cumberlands. The third part was the establishment of a Pharmacy Scholarship Program to encourage students to study pharmaceutical science.

The Pharmacy Scholarship Program is codified at KRS 164.7901(2)-(13). This scholarship program provides scholarship monies to individual students who direct the payment of their scholarship awards to the Kentucky pharmacy school they are attending. The awards are made by the Kentucky Higher Education Assistance Authority to the extent funds are otherwise available and allocated from coal severance tax revenues. KRS 164.7901(11)(b). Under KRS 164.7901(3) and (11)(a), scholarships are available to individuals who are United States citizens and Kentucky residents, who are enrolled or accepted in a full-time pharmacy program in the Commonwealth, who will serve one year as a pharmacist in Kentucky for each year that scholarship money is received, and who sign a promissory note with interest to repay the scholarship award if they fail to render the agreed service in Kentucky. The amount of the scholarship is calculated as the difference between the "in-state" tuition amount at the University of Kentucky College of Pharmacy and the prevailing tuition at the pharmacy school at which the student is enrolled.[17] KRS 164.7901(4).

Thus, one of the primary purposes of H.B. 380 was to increase the training and education of pharmacists at accredited pharmacy schools in Kentucky in order to reduce the perceived shortages, particularly in rural areas. Of course, in 2006, Kentucky only had one School of Pharmacy— the one at the University of Kentucky. Thus, H.B. 380 budgeted almost $80,000,000 to expand the pharmaceutical facilities at UK with the expectation of increasing admissions and graduates.

In addition, H.B. 380 sought to fund the construction of a new pharmacy school at the University of the Cumberlands. This, too, would have successfully increased the number of pharmacy admissions and graduates had it not violated Section 189 of the Kentucky Constitution.

Finally, H.B. 380 set up a scholarship program to be administered by the Kentucky Higher Education Assistance Authority and designed to ensure that those Kentucky residents not desirous of, or able to attend, the University of Kentucky College of Pharmacy could do so at any other "institution in the Commonwealth" *at the same amount* charged for "in-state" tuition at the University of Kentucky College of Pharmacy, subject, however, to future adequate funding for the scholarships and a pharmacy student's agreement to trade a year of practice in the Commonwealth for each scholarship year.

Thus, not only did the General Assembly provide the statutory framework in H.B. 380 to increase admissions and the number of pharmacy graduates, but it also designed the statutory scheme to assist those who would be more likely to practice in Kentucky, and thus, alleviate the perceived shortage.

**17.** By virtue of H.B. 406, the general appropriations bill for fiscal years 2008–2009 and 2009–2010, the General Assembly directed that "no funds should be transferred to the Pharmacy Scholarship Program Fund." *Executive Budget, 2008 Acts,* Ch. 127 (H.B. 406), reprinted in KRS Chapter 47.

The majority, however, invalidate these scholarship provisions based upon the statutory preamble which precedes the scholarship provisions and reads:

It is the intent of the General Assembly to establish a scholarship program to provide eligible Kentucky students the opportunity to attend an accredited school of pharmacy at a private four (4) year institution of higher education with a main campus located in an Appalachian Regional Commission county in the Commonwealth and become certified pharmacists in the Commonwealth.[18]

KRS 164.7901(1). Yet, the language contained in this statement of intent, or preamble, is not found within any of the actual scholarship provisions, which require *only* "an institution in the Commonwealth." KRS 164.7901(2); *see also* KRS 164.7901(11)(a) ("[S]cholarships to eligible students studying pharmacy in schools in the Commonwealth").

Plainly, as we noted in *Jasper v. Commonwealth*, 375 S.W.2d 709, 710 (Ky.1964), a "preamble is not the law. It is not necessary for its enactment, nor are its provisions binding. We cannot test the constitutionality of [an] Act by its preamble." (Citations omitted); *see also City of Elizabethtown v. Cralle*, 317 S.W.2d 184, 187 (Ky.1958) ("A preamble to a statute or ordinance, the same as a preamble to a

contract, is merely an introductory clause, expressing the reasons for and objects sought to be accomplished by the body of the enactment or agreement, and is not an essential part thereof."); *but see Jones v. City of Paducah*, 283 Ky. 628, 142 S.W.2d 365, 367 (1940) ("The recital may be resorted to as an aid in construction or interpretation, but it is not an essential part of the operative portions of the contract."). Here, however, no construction of the Scholarship Program is allowed as the scholarship's plain language necessitates no construction. In fact, the majority should go no further than to recognize the preamble's separability from the actual scholarship provisions. KRS 446.090.[19]

Yet, in reliance on *Milner v. Gibson*, 249 Ky. 594, 61 S.W.2d 273, 277 (1933) and *Lewis v. Jackson Energy Co-op. Corp.*, 189 S.W.3d 87, 92 (Ky.2005), the majority treats these mere "hopes" of the legislature as an *operative part* of the Scholarship Program, thus changing its wording. However, *Milner* dealt with a direct conflict between two legislative enactments of 1912 and 1932, which thus *required* construction. 61 S.W.2d at 276. In fact, the full quote in *Milner* reads:

*Statutes* in pari materia or those which relate to the same person or thing, or to the same class of persons or things, or which have a common purpose, must be

---

**18.** The Appalachian Regional Commission counties in Kentucky are: Adair, Bath, Bell, Boyd, Breathitt, Carter, Casey, Clark, Clay, Clinton, Cumberland, Edmondson, Elliot, Estill, Fleming, Floyd, Garrard, Green, Greenup, Harlan, Hart, Jackson, Johnson, Knott, Knox, Laurel, Lawrence, Lee, Leslie, Letcher, Lewis, Lincoln, McCreary, Madison, Magoffin, Martin, Menifee, Metcalfe, Monroe, Montgomery, Morgan, Nicholas, Owsley, Perry, Pike, Powell, Pulaski, Robertson, Rockcastle, Rowan, Russell, Wayne, Whitley, and Wolfe.

**19.** KRS 446.090 reads:

It shall be considered that it is the intent of the General Assembly, in enacting any statute, that if any part of the statute be held unconstitutional the remaining parts shall remain in force, unless the statute provides otherwise, or unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the General Assembly.

*construed together* and the legislative intention apparent from the whole enactment must be carried into effect.

*Id.* at 277 (emphasis added). Here, the actual scholarship provisions are very forward and clear, requiring only that the resident-student attend an "institution in the Commonwealth." KRS 164.7901(2). Thus, no construction is required and any legislative "hope," or intent, is irrelevant. "Where a statute is intelligible on its face, the courts are not at liberty to supply words or insert something or make additions however just or desirable it might be to supply an omitted provision." *AIK Selective Self–Insurance Fund v. Minton,* 192 S.W.3d 415, 418 (Ky.2006) (*quoting Berry v. Commonwealth,* 782 S.W.2d 625, 626 (Ky.1990)).

*Lewis* also *required* statutory construction to resolve an apparent conflict between the words "electric" and "energy." 189 S.W.3d at 91. Thus, the full quote reads:

> The single use of the word "electric" does not vitiate its application to the remainder of the statute. The statute must be read as a whole and in context with other parts of the law. All parts of the statute must be given equal effect so that no part of the statute will become meaningless or ineffectual.

*Id.* at 92. Here again, there is no internal conflict within the actual scholarship provisions that would allow, or require, this Court to interpret "an institution in the Commonwealth," KRS 164.7901(2), in any other manner than it reads, notwithstanding the "hopes" of the General Assembly as expressed in the preamble. KRS 164.7901. To do otherwise—where there is no internal need for construction—uses the preamble to change the clear acknowledgement in KRS 164.7901(2) and (11)(a) that the scholarship is available for attendance at an "institution in the Commonwealth."

Thus, the majority ultimately concludes "that the Pharmacy Scholarship Program was intended only for students attending the anticipated UC Pharmacy School. As such, it is special legislation that violates the Kentucky Constitution." Op. at 684. By this inappropriate application of the statutory rules of construction, the majority erroneously limits the class defined to "those pharmacy students enrolled or accepted for enrollment at the planned UC Pharmacy School." *Id.* at 685. This facilitates their ultimate conclusion that the scholarship program constitutes "special legislation," since it can benefit only those students who would have gone to the UC College of Pharmacy—even though there is *no* UC College of Pharmacy.

Again, as noted, *aside* from the preamble, the *actual* scholarship provisions apply "to persons who declare an intent to enroll in a Pharm.D. program at *an institution in the Commonwealth.*" KRS 164.7901(2) (emphasis added). Thus, the actual scholarship provisions *do not* limit the scholarships to students attending the "anticipated UC Pharmacy School."

Such logic also ignores the fact that the UC Pharmacy School was nothing more than a hope at the time of the enactment of KRS 164.7901 in 2006, while Sullivan University in Louisville, Kentucky, was *real* and in the process of starting an on-campus, private College of Pharmacy. It started its first class in 2008 and is now in the process of accreditation. Its first class will graduate in 2011.

Moreover, Midway College is currently progressing toward the opening of a private, on-campus, School of Pharmacy in Paintsville, Kentucky and is in the process of pre-candidate accreditation. Lexington Herald Leader, Monday, January 25, 2010, *Paintsville's Pharmacy School Follows a*

*Familiar Path,* by Dori Hjalmarson. Both Sullivan University and Midway College are secular institutions.

Legislatures hope for many things, but they *plan* for many more. That is their job—not ours. Things evolve and circumstances change, often beyond anyone's imagination. Thus, we should be circumspect in limiting an act of Kentucky's General Assembly to only one pre-determined outcome—here, the University of the Cumberlands—especially when it actually referred in the statutory framework not to UC, but to "an institution in the Commonwealth." KRS 164.7901(2), (11)(a). This broader reference to an institution is a sign of their wisdom and, hopefully, it will trigger ours.

Admittedly, students at the University of Kentucky College of Pharmacy cannot receive the benefit of the scholarships. But why would they? The Scholarships, if ever fully funded, can only reduce another pharmacy school's tuition to what UK pharmacy students already pay. KRS 164.7901(4). Moreover, the statutory scheme reflects the fact that the UK School of Pharmacy is already substantially publicly funded, was the recipient of an additional $80,000,000 under H.B. 380, and the number of slots available at UK (which the legislature hoped to increase) were limited in number.

Clearly then, the General Assembly recognized that it needed to create additional slots at other schools to attack the shortage. In fact, when properly funded, KRS 164.7901(4) works no disadvantage to students of the University of Kentucky College of Pharmacy, as it does not put those attending UK at any financial disadvantage, but merely funds other slots at other schools *at the same price* as UK so that more Kentucky students may become pharmacists, Kentucky may reduce its

pharmacist shortage sooner, and, hopefully, Kentuckians will enjoy better health.

"In order for legislation to be permissible under § 59 of the Kentucky Constitution: '(1) It must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification.'" *Yeoman v. Commonwealth, Health Policy Bd.,* 983 S.W.2d 459, 466 (Ky.1998) (citations omitted). "In performing an analysis under § 59, determining whether the first prong of the test is satisfied should be a fairly straightforward matter. Either the laws do apply to everyone in the class equally or they do not." *Id.* at 468.

The majority's construction, paradoxically, commands the inclusion of UK's pharmacy students in the class they envision as proper, even though the number of slots available at UK (currently the only accredited pharmacy school in Kentucky) has contributed to the shortage, and even though the scholarship funding mechanism is designed to keep the cost of new pharmacy school slots pegged at the "in-state tuition" rate of UK's College of Pharmacy. Consequently, with the majority's result, the Kentucky General Assembly is prohibited from solving the shortage within a quicker time frame as would be possible with other available pharmacy school slots; this, even though UK received the bulk of H.B. 380's funds—almost $80,000,000!

However, as hopefully can now be seen, the General Assembly appropriately drew the class to be all Kentuckians attending pharmacy school in Kentucky, who either did not want to, or could not, attend the University of Kentucky College of Pharmacy. As shown, the drawing of the class in this manner works no disadvantage to those who are qualified (and lucky enough!) to fill the limited number of slots available at UK's College of Pharmacy. This is the class designed by the General

Assembly in KRS 164.7901(2), (3), and (4), and, plainly, every member of this class would have the same opportunity if and when there is adequate funding available. Thus, KRS 164.7901 satisfies the first prong.

"However, deciding whether the classification itself is valid can be substantially more complex." *Yeoman*, 983 S.W.2d at 468. Thus, "the burden is on the party claiming the validity of the classification to show that there is a valid nexus between the classification and the purpose for which the statute in question was drafted." *Id.* "There must be substantially more than merely a theoretical basis for a distinction. Rather, there must be a firm basis in reality." *Id.*

Here, "[t]he primary, or even secondary purpose of [KRS 164.7901] is clearly the improvement of the health care system in the Commonwealth." *Id.* Moreover, it is clear that with one pharmacy school in the Commonwealth, we have not been able to meet the need for pharmacists in Kentucky, especially in rural Kentucky. "Thus, far from being random and arbitrary, the classification created by [KRS 164.7901] is specifically tailored" to provide more pharmacists for Kentucky, *id.* at 469, and provide them *more quickly* than just one school could. Thus, "[t]he requirement that there be a valid nexus between the classification and the intent is thereby satisfied." *Id.* Plainly then, KRS 164.7901 satisfies the requirement of Section 59 of the Kentucky Constitution.

Thus, I must respectfully dissent from the majority's conclusion that KRS 164.7901 violates it.

VENTERS, J., joins.