RENDERED: SEPTEMBER 24, 2020
TO BE PUBLISHED

## Supreme Court of Kentucky

2019-SC-0391-WC

CALLOWAY COUNTY SHERIFF'S                                APPELLANT
DEPARTMENT


ON APPEAL FROM COURT OF APPEALS
V.                    CASE NO. 2018-CA-1509
NO. 07-WC-91750


KAREN WOODALL, SPOUSE OF STEVEN                          APPELLEES
SPILLMAN, DECEASED; ESTATE OF
STEVEN SPILLMAN; KAREN WOODALL
AND JENNIFER NELSON, CO-
ADMINISTRATRICES; HON. STEPHANIE L.
KINNEY, ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION BOARD


AND


2019-SC-0419-WC


KAREN WOODALL, SPOUSE OF STEVEN                     CROSS-APPELLANTS
R. SPILLMAN, DECEASED; ESTATE OF STEVEN
R. SPILLMAN BY AND THROUGH THE CO-
ADMINISTRATORS, KAREN WOODALL AND
JENNIFER NELSON


V.                    ON APPEAL FROM COURT OF APPEALS
CASE NO. 2018-CA-1509
NO. 07-WC-91750


CALLOWAY COUNTY SHERIFF'S DEPARTMENT;              CROSS-APPELLEES
HON. STEPHANIE L. KINNEY, ADMINISTRATIVE
LAW JUDGE; WORKERS' COMPENSATION
BOARD; AND DANIEL JAY CAMERON, ATTORNEY
GENERAL OF KENTUCKY

KRS[1] Chapter 342.750 provides certain income benefits to an employee's family when an employee dies as a result of a workplace accident. In addition, if the death occurs within four years of the injury, the employee's estate is entitled to a $50,000 lump-sum payment. In this case, ten years after a workplace injury, Steven Spillman died as a result of surgery necessitated by that injury. The issues we address in this opinion are whether Karen Woodall, Spillman's surviving spouse, is entitled to a statutory income benefit and whether the time limitation as to the lump-sum benefit violates the federal and Kentucky constitutional guarantees of equal protection and Kentucky's prohibition against special legislation. We hold that Woodall is entitled to the income benefit and that the time limitation does not violate the constitutional provisions. We therefore affirm the Court of Appeals' opinion affirming the Workers' Compensation Board ("Board").

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Spillman was working for the Calloway County Sheriff's Department ("the Department") on March 4, 2007, when he was involved in a serious motor vehicle accident. In 2010, Spillman was awarded permanent partial disability ("PPD") benefits dating to June 2007. The case was re-opened in 2013, and in October of that year, he was awarded increased PPD benefits for the remainder of the 425 weeks that he was entitled to those benefits. In January 2017,

---

[1] Kentucky Revised Statutes.

Spillman underwent surgery for his work-related injury. Unfortunately, he developed a pulmonary embolism following surgery and died on January 17, 2017.

At all times relevant to this matter, Spillman and Woodall were married. Following Spillman's death, Woodall and Jennifer Nelson, Spillman's daughter, were named co-administrators of Spillman's estate.[2] Woodall, in her individual capacity as Spillman's spouse, and the Estate filed a motion to re-open Spillman's workers' compensation claim. Woodall sought income benefits under KRS 342.750(1)(a) while the Estate sought a lump-sum benefit under KRS 342.750(6).

The ALJ denied all benefits, finding that they were time barred, and dismissed the claims. The Board found that Woodall was eligible for the surviving spouse income benefits under KRS 342.750(1)(a), but that the Estate was not entitled to the lump-sum death benefit. The Court of Appeals affirmed the Board on both issues. Both parties have appealed to this Court.

## II.     STANDARD OF REVIEW.

When reviewing workers' compensation cases, we review questions of law de novo. *Saint Joseph Hosp. v. Frye*, 415 S.W.3d 631, 632 (Ky. 2013). In this case, the facts are undisputed and all issues under review are legal issues. Therefore, we engage in a de novo review.

## III.     ANALYSIS.

### A.     KRS 342.750(1) Income Benefits.

---

[2] We refer to Woodall and Nelson in their capacities as co-administrators of the Estate of Steven Spillman collectively as the "Estate."

3

The Department appeals from the Court of Appeals' holding that awarded benefits to Woodall under KRS 342.750(1)(a). The Department argues that a widow cannot claim death benefits after the deceased's 425 weeks of PPD benefits have been paid in full. The Department also argues that in order for the widow to receive death benefits, the award would have to be reopened in order to increase the initial award from PPD to a death claim.[3] The Department asserts that KRS 342.125(3), as amended in 2018, is retroactive and now prohibits reopening the award if more than four years has elapsed since the initial award. The Department maintains that this time limit bars Woodall's benefits claim.

In response to the Department's arguments, Woodall contends that the 2018 amendment to KRS 342.125(3) regarding reopening claims is not retroactive, but that if it is, retroactivity is unconstitutional as applied in this case.

### 1. *Woodall properly filed a claim for benefits in her own right.*

Procedurally, a widow is entitled to assert her claim for death benefits. In *Family Dollar v. Baytos*, we held that KRS 342.750 "create[s] a separate cause of action for [a] surviving spouse[] independent of the injured worker's claim." 525 S.W.3d 65, 72 (Ky. 2017). The Department attempts to distinguish *Baytos*, but any factual differences do not affect the holding that the proper way for a widow to assert her claim is "to file a claim for benefits in

---

[3] Woodall asserts that this argument was not preserved by the Department, as it did not cross-appeal from the ALJ's decision. Because the Department prevailed before the ALJ, however, the Department had no need to appeal. *See Fischer v. Fischer*, 348 S.W.3d 582, 594–95 (Ky. 2011), *abrogated on other grounds by Nami Res. Co., LLC v. Asher Land & Mineral, Ltd.*, 554 S.W.3d 323, 323 (Ky. 2018).

4

her own right." *Id.* Because reopening is inapplicable to this case, we need not address the parties' arguments about the retroactivity of the 2018 amendment to KRS 342.125(3).

### 2. KRS 342.750(1)(a) contains no temporal limitation on Woodall's receipt of income benefits.

Additionally, the Department argues that a widow cannot claim death benefits after the deceased's 425 weeks of PPD benefits have been paid in full. A related issue is whether the four-year limitation found in KRS 342.750(6) also applies to KRS 342.750(1)(a). In pertinent part, KRS 342.750 states as follows:

> If the injury causes death, income benefits shall be payable in the amount and to or for the benefit of the persons following, subject to the maximum limits specified in subsections (3) and (4) of this section:
>
> (1) (a) If there is a widow or widower and no children of the deceased, to such widow or widower 50 percent of the average weekly wage of the deceased, during widowhood or widowerhood.
>
> . . . .
>
> (6) In addition to other benefits as provided by this chapter, if death occurs within four (4) years of the date of injury as a direct result of a work-related injury, a lump-sum payment of fifty thousand dollars ($50,000) shall be made to the deceased's estate, from which the cost of burial and cost of transportation of the body to the employee's place of residence shall be paid.

The statute's plain text demonstrates that the four-year limitation found in subsection (6) does not apply to subsection (1)(a). However, to dispel any doubt, *Baytos* also addressed this issue, albeit in a footnote as it was not material to the Court's decision. This Court stated, clearly:

> The portion of this provision relating to income benefits has no such limitation—in fact, there is no temporal limitation whatsoever within KRS 342.750 for the recovery of death benefits. The four-

5

year limitation . . . only applies to KRS 342.750(6), a separate provision within this statute relating to an estate's entitlement to a $50,000 lump-sum payment to offset costs of burial and transportation of the body.

525 S.W.3d at 68 n.2. Not only did we interpret KRS 342.750 such that the four-year time limitation does not apply to income benefits under subsection (1), but we also held *"no temporal limitation whatsoever"* on the recovery of death benefits under the statute. *Id.* (emphasis added).

The Department again argues that the instant case is distinguishable from *Baytos*. The deceased worker, Baytos, had settled his workers' compensation injury claim with his employer for a lump sum, which he received. Baytos died the next year as a result of his work-related injury. Two years after that, Baytos's widow asserted her claim for death benefits. As noted, we determined that she was entitled to a death benefit. In the instant case, Spillman received his full 425 weeks of PPD before his death. The Department argues that because Baytos died before his 425 weeks of PPD benefits *would have* expired, Baytos's widow was entitled to death benefits while Spillman's widow was not. These limited factual distinctions, however, do not compel a different legal result. The claims of both Baytos and Spillman had been settled, paid in full, and closed.

The plain language of KRS 342.750(1)(a) does not impose any temporal limitation on benefits available, and we decline to read one into it. We therefore affirm the Court of Appeals' holding regarding benefits under KRS 342.750(1)(a). The Court of Appeals affirmed the Board's holding, which had remanded to the ALJ for a determination of Woodall's eligibility for benefits under this statute.

6

## B. KRS 342.750(6) Lump-Sum Death Benefit.

The final issue we must address is whether the four-year limitation on lump-sum benefits under KRS 342.750(6) is constitutional. That statute provides, in pertinent part,

> [I]f death occurs within four (4) years of the date of injury as a direct result of a work-related injury, a lump-sum payment of fifty thousand dollars ($50,000) shall be made to the deceased's estate, from which the cost of burial and cost of transportation of the body to the employee's place of residence shall be paid.

The Estate argues that this time limitation violates the 14th Amendment to the United States Constitution and sections 1, 2, 3, 59, and 60 of the Kentucky Constitution. Specifically, it argues that the time limitation violates the constitutions' guarantee of equal protection of the law and the Kentucky Constitution's prohibition against special legislation.

### 1. Equal Protection.

Our equal protection guarantees, both under the federal and state constitutions, seek to "keep[] governmental decision makers from treating differently persons who are in all relevant respects alike." *Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455, 465 (Ky. 2011) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)) (internal quotation marks omitted). Classifications are not per se unconstitutional, however. *Vision Mining*, 364 S.W.3d at 465. Rather, classifications are subject to different levels of judicial review based on their content. *Id.* The highest level of review, "strict scrutiny," applies when a classification affects a fundamental right or suspect classification, such as race, alienage or ancestry. *Steven Lee Enters. v. Varney*, 36 S.W.3d 391, 394 (Ky. 2000). An intermediate level of review, "heightened scrutiny," applies to classifications such as gender or illegitimacy. *Id.* The lowest level of review,

7

"rational basis," applies to statutes that merely affect only social or economic policy. *Teco/Perry Cty. Coal v. Feltner*, 582 S.W.3d 42, 46 (Ky. 2019); *Zuckerman v. Bevin*, 565 S.W.3d 580, 595 (Ky. 2018); *Varney*, 36 S.W.3d at 394-95.

Kentucky courts have long held that "[w]orkers' compensation statutes concern matters of social and economic policy." *Feltner*, 582 S.W.3d at 46 (citing *Cain v. Lodestar Energy, Inc.*, 302 S.W.3d 39, 42 (Ky. 2009)). As a result, most classifications created within our workers' compensation statutes only need satisfy rational basis review.[4] Thus, to comply with federal equal protection requirements, the classification must be rationally related to a legitimate state interest, and to comply with Kentucky's equal protection requirements, the classification must be supported by a "reasonable basis" or a "substantial and justifiable reason." *Id.* (citing *Cain*, 302 S.W.3d at 42–43). In fact, "[a] person challenging a law upon equal protection grounds under the rational basis test has a very difficult task because a law must be upheld if . . . any reasonably conceivable state of facts . . . could provide a rational basis for the classification." *Commonwealth ex rel. Stumbo v. Crutchfield*, 157 S.W.3d 621, 624 (Ky. 2005) (citing *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 178–79, 101 S. Ct. 453, 461, 66 L.Ed.2d 368 (1980)). Furthermore, "the General Assembly need not articulate its reasons for enacting the statute, and this is particularly true where the legislature must necessarily engage in a process of line drawing." *Id.* (citing *Fritz*, 449 U.S. at 179, 101 S. Ct. at 461).

---

[4] Obviously, if a classification within these statutes were to be based on a protected class, then a higher level of review would apply. That is not the case here.

8

Accordingly, "[o]ur General Assembly, under the Equal Protection Clause, has great latitude to enact legislation that may appear to affect similarly situated people differently." *Id.* (citation omitted).

In the present case, Woodall argues that the time restriction in KRS 342.750(6) treats the estates of injured workers who die more than four years after their injuries differently than it treats the estates of workers who die within four years after their injuries, without a rational basis for doing so. The Court of Appeals rejected this argument. It held instead that the time limitation "serves to bar stale claims, which provides stability and foreseeability to claimants and employers alike, thereby promoting the overall viability of the workers' compensation system." Before this Court, the Department similarly argues that the time limitation in KRS 342.750(6) is no different than a statute of limitations in that it allows the workers' compensation system to affix a specific cut-off point to assess risk and spread costs within the system. With these arguments in mind, we now consider whether the time limitation contained within KRS 342.750(6) denies equal protection of the laws to those workers who die from a work-related injury more than four years after the date of the injury.

As an initial matter, we first note that, despite the Department's characterization, KRS 342.750(6) is not a statute of limitations. As we have previously explained, "[a] statute of limitations limits the time in which one may bring suit *after* the cause of action accrues, while a statute of repose potentially bars a plaintiff's suit *before* the cause of action accrues." *Coslow v.*

*General Elec. Co.*, 877 S.W.2d 611, 612 (Ky. 1994).[5] Here, KRS 342.750(6) provides the lump-sum death benefit only to estates of employees who die within four years of their injury. In this way, it limits an estate's ability to obtain the lump-sum death benefit if more than four years have passed between the work-related injury and the death. In other words, it potentially bars an estate's claim for lump-sum benefits before the event triggering entitlement to the benefits occurs. Accordingly, the statute is more akin to a statute of repose than a statute of limitations.

That noted, this Court has held on multiple occasions that "no constitutional impediment [exists] to repose provisions in the workers' compensation scheme." *Wright v. Oberle-Jordre Co.*, 910 S.W.2d 241, 245 (Ky. 1995); *see also Nygaard v. Goodin Bros., Inc.*, 107 S.W.3d 190, 192 (Ky. 2003) (holding legislature is not constrained in including statutes of repose in statutory causes of action such as workers' compensation); *William A. Pope Co. v. Howard*, 851 S.W.2d 460, 463 (Ky. 1993) (stating "[w]e have not been persuaded that there is any constitutional prohibition against the enactment of repose provisions within the Workers' Compensation Act[]").[6]

The Estate cites this Court's decisions in *Vision Mining, Inc. v. Gardner* and *Parker v. Webster Cty. Coal, LLC*, 529 S.W.3d 759, 770 (Ky. 2017), both of

---

[5] "'Repose' means 'rest,' and the philosophical foundation of statutes of repose is that after so long a period, a defendant has a right to no longer be exposed to the potential of a lawsuit, even if the plaintiff does not discover the injury until long after the event." 13 Ky. Prac. Tort Law § 10:43 (2019 ed.).

[6] By contrast, constitutional rights may be implicated in the abolition of common law rights of action. *See, e.g., Saylor v. Hall*, 497 S.W.2d 218, 225 (Ky. 1973) (holding that statute of repose in KRS 413.135 violates Sections 14, 54, and 214 of the Kentucky Constitution).

which invalidated statutory classifications within KRS Chapter 342 on equal protection grounds. Neither case, however, involved time limitations contained within the statutory scheme and do not, therefore, compel the Estate's argued result. In this case, the four-year limit applies equally to all injured workers. Substantial and justifiable reasons support this classification and the classification is rationally related to a legitimate government purpose.

Employers are entitled to rely on repose provisions, "freeing them from any liability for compensation after the passage of" the repose period. *Wright,* 910 S.W.2d at 245. Here, we are similarly persuaded that employers are entitled to rely on the repose provision of KRS 342.750(6). We agree that doing so bars stale claims, permits assessment of risk, and spreads costs within the workers' compensation system.

We therefore hold that the time limitation in KRS 342.750(6) satisfies both state and federal equal protection guarantees.

### 2. *Special Legislation.*

Finally, but no less importantly, we turn to the Kentucky Constitution's prohibition on special legislation. For too long this Court has misconstrued the proper analysis for the special legislation prohibition contained within Kentucky Constitution Section 59, and conflated its meaning with Kentucky Constitution Section 3's prohibition on "exclusive, separate public emoluments or privileges[,]" the basis of Kentucky's guarantee of equal protection. Such interpretation does not comport with a proper interpretation of these sections as understood in 1891.

11

In analyzing claims under Section 59, this Court for over 65 years has seen fit to apply the test set out in *Schoo v. Rose*, 270 S.W.2d 940 (Ky. 1954),[7] which stated "in order for a law to be general in its constitutional sense it must meet the following requirements: (1) [i]t must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification." *Id.* at 941. However, *Schoo's* foundation is based on cases interpreting the federal Equal Protection clause or Section 3, **not** Section 59's prohibition on special legislation.[8] *See Safety Bldg. & Loan Co. v. Ecklar*, 106 Ky. 115, 50 S.W. 50 (1899), *overruled in part by Linton v. Fulton Bldg. & Loan Ass'n*, 262 Ky. 198, 90 S.W.2d 22 (1936). In fact, the *Schoo* test comes straight from *Ecklar*: "the true test whether a law is a general one, in the constitutional

_____

[7] Or a case which cited to *Schoo* as authority.

[8] The court in *Schoo* included a citation to *Droege v. McInerney*, 120 Ky. 796, 87 S.W. 1085, 1085 (1905). *Droege* involved a local statute concerning county election boards in counties containing second class cities. With respect to local acts, the 1891 Constitution permitted the legislature to classify cities. Ky. Const. § 156. Such a classification, however, had to relate to "the purpose of organization and government[;]" otherwise, it was an unconstitutional local law. *See Richardson v. Mehler*, 111 Ky. 408, 63 S.W. 957, 962 (1901) (noting that § 156, with regard to municipalities, is an exception to § 59, and that "the classification of cities authorized by the constitution . . . is confined to legislation for purposes of municipal government only, and that legislation relating to matters not under municipal control, or affecting the municipal government, is unconstitutional[]"); *see also City of Louisville v. Kuntz*, 104 Ky. 584, 47 S.W. 592, 593 (1898). *Droege, Richardson, Kuntz*, and similar cases involving local laws are thus properly viewed as interpretations of § 156. We note, of course, that § 156 has been amended and replaced with § 156a and § 156b. We refrain from any interpretation of these amended sections since this case does not involve a local law. We do, however, note that, like its predecessor, § 156a permits classification of cities.

*Klein v. City of Louisville*, 224 Ky. 624, 6 S.W.2d 1104 (1928), cited by the concurring opinion, involved numerous state constitutional challenges to authorizing cities of the first class to construct and operate bridges across navigable streams constituting a state boundary. As concerns §§ 59 and 156, the act in question related to the classification of cities as permitted by Ky. Const. § 156. In rejecting this challenge, the court noted that "if the act is within the purview of [§ 156] the provisions of section 59 do not apply to it." 224 Ky. at 629, 6 S.W.2d at 1106. *Klein*, thus, supports the foregoing analysis of the interplay of §§ 59 and 156.

12

sense, is not alone that **it applies equally to all in a class**—though that is also necessary, —but, in addition, **there must be distinctive and natural reasons inducing and supporting the classification.**" 106 Ky. at 121–22, 50 S.W. at 51 (emphasis added). Other cases decided contemporaneously with or prior to *Ecklar* use the same or similar language as *Ecklar* in interpreting Section 3 or Section 3's predecessor provision in the 1850 Constitution, Art. XIII, § 1. *See, e.g., Commonwealth v. Remington Typewriter Co.*, 127 Ky. 177, 105 S.W. 399, 402–03 (1907); *Simpson v. Kentucky Citizens' Bldg. & Loan Ass'n*, 101 Ky. 496, 41 S.W. 570 (1897), *overruled in part by Linton*, 262 Ky. 198, 90 S.W.2d 22; *Schoolcraft's Adm'r v. Louisville & Nashville R.R.*, 92 Ky. 233, 238, 17 S.W. 567, 568 (1891); *Kentucky Trust Co. v. Lewis*, 82 Ky. 579, 583–84 (1885); *Smith v. Warden*, 80 Ky. 608, 611 (1883); *Gordon v. Winchester Bldg. & Accumulating Fund Ass'n*, 75 Ky. (12 Bush) 110, 113–14 (1876). In these earlier decisions, our predecessor court addressed claims of partial/class legislation under Kentucky's equal protection guarantee, *i.e.*, the state constitution's prohibition on "exclusive, separate privilege." Ky. Const. § 3; Ky. Const. of 1850, Art. XIII, § 1.

The original test for a violation of Section 59's prohibition on special and local legislation was simply "special legislation applies to particular places or persons as distinguished from classes of places or persons." *Greene v. Caldwell*, 170 Ky. 571, 587, 186 S.W. 648, 654 (1916); *see also Singleton v. Commonwealth*, 164 Ky. 243, 175 S.W. 372, 373 (1915) (holding "[l]ocal or special legislation, according to the well-known meaning of the words, applies exclusively to special or particular places, or special and particular persons, and is distinguished from a statute intended to be general in its operation and

13

that relating to classes of persons or subjects[]") (quoting *Stone v. Wilson*, 19

Ky. L. Rptr. 126, 39 S.W. 49, 50 (1897), *overruled on other grounds by Vaughn*

*v. Knopf*, 895 S.W.2d 566 (Ky. 1995));[9] *Commonwealth v. E. H. Taylor, Jr. Co.*,

101 Ky. 325, 41 S.W. 11, 15 (1897) (holding that a whiskey tax did not

constitute special legislation because "[i]t cannot be contended that this law

applies alone to the [distiller], or to Franklin County, or to the Seventh

congressional district. It operates upon a multitude of property of like

character, owned by persons all over the state, and . . . is neither local nor

special, but general[]").[10]

After the decision in *Greene*, however, and with the passage of time, the

clear distinction between special/local laws and partial/class laws became

muddled. The reason for the muddling would seem to be that partial/class

legislation was short-handedly referred to as "special legislation." Presumably,

as lawyers and judges looked to apply the constitution and case law to various

statutes and situations, they quite obviously saw a constitutional section,

Section 59, which addressed "local and special" legislation and read case law

that applied, erroneously, a classification test to it. In a few cases addressing

claims of Section 59 violations, the court might include citation to *Singleton* or

*Stone*, but invariably, in the same paragraph, cite *Ecklar* and *Remington*

---

[9] Significantly, Judge John Carroll—who authored *Greene*, *Singleton* and *Remington Typewriter*—was a delegate to the 1890-91 Constitutional Convention. His analysis of §§ 3's and 59's meanings and purposes is more reflective of the delegates' original understanding than one developed decades after the fact.

[10] In *Zuckerman*, we purported to apply the *Schoo* test, but we noted "[f]rankly, the Act applies to all collective bargaining agreements entered into on or after January 9, 2017. . . . With the exceptions required by federal law, it applies to all employers and all employees, both public and private. It does not single out any particular union, industry or employer. It applies statewide." 565 S.W.3d at 600. This conclusion is consistent with the original § 59 analysis.

*Typewriter* originally decided under Section 3. *E.g., Markendorf v. Friedman,* 280 Ky. 484, 133 S.W.2d 516 (1939); *Lakes v. Goodloe,* 195 Ky. 240, 242 S.W. 632 (1922). The effect was to equate special/local legislation with class legislation.

The result has been that our analysis of two constitutional sections, that proceed from different constitutional eras with different purposes,[11] essentially apply the same analysis. For example, in *Waggoner v. Waggoner,* 846 S.W.2d 704 (Ky. 1992), this Court stated that a statute passes muster under Section 59 if the classification is "based upon reasonable and natural distinctions that relate logically to the purpose of the Act." *Id.* at 707. Similarly, it will be upheld under the federal and state equal protection clauses "if its classification

---

[11] The constitutional prohibition against "exclusive, separate" privilege has been included in all four Kentucky Constitutions, beginning with the Commonwealth's 1792 founding. Ky. Const. of 1792, Art. XII, § 1; *see also* Ky. Const. of 1799, Art. X, § 1. The section, however, has an even earlier origin, the 1776 Virginia Declaration of Rights, section 4, providing "[t]hat no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services; which, not being descendible, neither ought the offices of magistrate, legislator, or judge to be hereditary." Drafted by George Mason, this provision asserted the equality of all citizens and rejected ideas of privileged political classes or hereditary offices. Before the Civil War, most state courts ascribed equal protection to their state constitutions' "exclusive, separate" privilege clause to prohibit partial or special laws. *See* Melissa L. Saunders, *Equal Protection, Class Legislation, and Colorblindness,* 96 Mich. L. Rev. 245, 251–68 (1997) (discussing antebellum court decisions striking down partial or special laws that singled out individuals for special benefits or burdens). Our predecessor court's 1876 decision in *Gordon,* however, was the first Kentucky case to apply the prohibition directly and hold an act unconstitutional. *See Barbour v. Louisville Bd. of Trade,* 82 Ky. 645, 650 (1885) (noting *Gordon* as the "first case in which the meaning of this provision arose and was decided, without division[]"). Professor Saunders also connected the antebellum prohibition of "exclusive, separate" privilege with the adoption of 14th Amendment's equal protection clause. Saunders, *supra,* at 285–93. The similar treatment of claims under the 14th Amendment's equal protection clause and Kentucky's Section 3 are, thus, unsurprising.

By contrast, §§ 59 and 60 first appear in the 1891 Constitution, and, as discussed *infra,* were designed to rectify the inefficiency that characterized postbellum legislative sessions.

15

is not arbitrary, or if it is founded upon any substantial distinction suggesting the necessity, or propriety, of such legislation." *Id.* at 708. Thus, the tests seem to be a difference without a distinction. This makes little sense. The reason is that the currently applied test for Section 59, the *Schoo* test, originated with equal protection cases interpreting a different constitutional section, namely Section 3's prohibition on "exclusive, separate" privileges.

We are mindful of the doctrine of stare decisis "which simply suggests that we stand by precedents and not disturb settled points of law. Yet, this rule is not inflexible, nor is it of such a nature as to require perpetuation of error or illogic." *D & W Auto Supply v. Dep't of Revenue,* 602 S.W.2d 420, 424 (Ky. 1980).

The problem with applying an equal protection analysis to the special legislation prohibition is that over the last 30 years, it has been cited to enhance Kentucky's equal protection provisions. *See, e.g., Elk Horn Coal Corp. v. Cheyenne Res., Inc.,* 163 S.W.3d 408, 418 (Ky. 2005); *Commonwealth v. Wasson,* 842 S.W.2d 487 (Ky. 1992); *Perkins v. N.E. Log Homes,* 808 S.W.2d 809 (Ky. 1991); *Tabler v. Wallace,* 704 S.W.2d 179 (Ky. 1986). In *Elk Horn Coal,* this Court stated:

> [T]he equal protection provisions of the Kentucky Constitution are enhanced by Section [sic] 59 and 60. . . .
>
> Because of this additional protection, **we have elected at times** to apply a guarantee of individual rights in equal protection cases that is higher than the minimum guaranteed by the Federal Constitution. Instead of requiring a "rational basis," we have construed our Constitution as requiring a "reasonable basis" or a "substantial and justifiable reason" for discriminatory legislation in areas of social and economic policy. **Cases applying the heightened standard are limited to the particular facts of those cases.**

16

163 S.W.3d at 418–19 (emphasis added) (citations and footnotes omitted). The highlighted portions of this quotation point out the problem. No one knows or can possibly know when a given statute will strike any judge, or four justices of this court, as worthy of the heightened standard. This unfettered discretion is unworthy of any legal system.

This Court's decision in *Tabler* is the genesis of the heightened standard analysis of Section 59. To be clear, the *Tabler* court did not create the muddle of conflating Sections 3 and 59's analysis. That process had begun long before. The *Tabler* court did, however, imbue Section 59 with an inappropriate purpose by relating a historical narrative of the 1880's and the 1890-91 Constitutional Convention that is overly simplistic and misleading. According to *Tabler*, this era was one dominated by corporations and railroads and their lobbyists running roughshod over an especially malleable and corrupt legislature. *See Tabler*, 704 S.W.2d at 183 (stating "[u]nbridled legislative power had become the captive of special interest groups. Concern for limiting the powers of the legislature in general, and with cutting off special and local legislation in particular, was the primary motivating force behind enactment of the new Kentucky Constitution of 1891[.]") And the call for the Constitutional Convention only passed because the people "rose up" in reaction. *See id.* at 186 (noting that due to a growing number of lawsuits "railroads and others had sought and obtained special privileges from the General Assembly during the 1880's and thus precipitated a constitutional convention[]").

This narrative ignores a number of salient facts. First, the idea that the legislature was controlled by the railroads or other corporations is demonstrably false. Although the legislature had chartered nearly 300

17

railroads, most never came into operation. In 1885, three railroads owned or controlled 80% of statewide trackage: the Louisville & Nashville, the Chesapeake & Ohio, and the Cincinnati Southern. 6th Ann'l Rep't of the Railroad Commissioners of Kentucky 5–6 (1886). While the L&N in particular was, no doubt, a ruthless competitor and a source of ire to many Kentuckians, neither it nor the other two railroads controlled the legislature. These three fought the Railroad Commission relentlessly after its establishment in 1880, unsuccessfully lobbied for its repeal in every legislative session from 1882 to 1890, 12th Ann'l Rep't of the Railroad Commissioners of Kentucky 6 (1891), and unsuccessfully fought its increased taxation of railroad property. *Cincinnati, New Orleans & Tex. Pac. R.R. v. Commonwealth*, 81 Ky. 492 (1883), *aff'd* 115 U.S. 321 (1885).[12]

Second, the legislature did not exempt railroads from tort liability. The opposite is true. In 1854, it enacted an early wrongful death statute, providing

---

[12] Other instances of the legislature not responding to corporate/railroad interest exist. In 1876, it elected James Beck to the United States Senate over Preston Leslie, the L&N's preferred candidate. Thomas D. Clark, *A History of Kentucky* 422 (6th ed., 1988). Over two legislative sessions, 1876 and 1878, it reduced the permitted rate of interest from ten percent to six percent, notwithstanding opposition by commercial and financial interests. Edward F. Pritchard, Jr., "Popular Political Movements in Kentucky 1875-1900," 41–43 (1935). And, in 1886, the legislature enacted the Hewitt Tax Law eliminating many tax exemptions and increasing by $90,000,000 the assessed value of all Kentucky property. *Id.* at 96–97.

One act sometimes cited to prove railroad domination of the legislature was the 1884 law to exempt new railroad facilities from taxation for period of five years from the start of construction. Act of May __, 1884, ch. 1632, 1883 Ky. Acts 1:135. That argument certainly exists, but countervailing arguments can be made. The originally proposed bill contained a ten-year exemption, which was amended to five years. S.J. 1036 (Ky. 1883). Would not a controlling railroad lobby have gotten the ten-year exemption? And a better law for the railroads would have been exemption from taxation for five years "after completion," as opposed to "from the start of construction." Additionally, the exemption would encourage construction of new railroads to underserved areas. *See* Carl B. Boyd, Jr., *Local Aid to Railroads in Central Kentucky: 1850-1891*, 62 Reg. Ky. St. Hist. Soc'y 4, 10–13 (1964) (noting demand for railroad construction came from local communities).

18

a cause of action for death due to a railroad's negligence, and also providing for loss or damage to property. Stanton, 2 Rev. Stat. 510 § 1 (Ky. 1860). This statute was in effect throughout the postbellum period and into the 20th century. The L&N's challenge under the 1850 Constitution, alleging a violation of Article XIII, Section 1's prohibition on exclusive, separate privilege, was rejected by our predecessor court in 1891. *Schoolcraft's Adm'r*, 92 Ky. 233, 17 S.W. 567.

Third, legislative dysfunction in enacting so much special legislation was a result more of constituent demand, than of corporate or railroad lobbying. Gubernatorial addresses and contemporary newspapers articles so confirm. *See, e.g.,* H. J. 44, 72 (Ky. 1875) (address of Gov. James B. McCreary, noting time spent during legislative sessions on local and private bills); H. J. 8, 28 (Ky. 1869) (address of Gov. John W. Stevenson "call[ing] attention to the increasing legislation on local and individual interests[]"); "Stop Local Legislation," *Hickman Courier*, Oct. 2, 1885, at 5) (quoting *Louisville Commercial*) (noting "[t]the members excused their neglect of general legislation with the plea that their constituents demanded attention to their local bills[]"); *Owensboro Messenger*, Mar. 14, 1882, at 2 (stating "[t]he complaint that the Legislature occupies its time with local bills is general . . .; but we dare say the members act in accordance with the wishes of their constituents in giving local measures precedence[]"); "Local Legislation," *Courier-Journal* (Louisville), May 26, 1873, at 2 (opining that "the people of the State are themselves, in great measure, responsible for the vast number of local and private measures that have been the curse of Kentucky legislation[]); *see also* Robert M. Ireland, *Little Kingdoms: The Counties of Kentucky, 1850-1891*, 8-17 (1977) (detailing many local acts

19

and the inefficiency caused by their proliferation).[13] Professor J. Willard Hurst, the preeminent American legal historian,[14] opined that the case against special legislation "came to be [the] undue drain on the time of legislatures." James Willard Hurst, *Law and the Conditions of Freedom in the Nineteenth Century United States* 17 (1984). In other words, contemporary sources and legal historians demonstrate that the main problem with local and special legislation was the resulting legislative inefficiency and wasted time, as opposed to the corrupt, rent-seeking motive ascribed by the *Tabler* court. The simple test set forth by our predecessor court evinces a purpose to the special legislation prohibition that is rooted in legislative efficiency, *i.e.*, to put an end to the interminable legislative sessions of the 1870s and 1880s and the proliferation of special and local laws that predominated the Kentucky session laws before 1891. The vast majority of these laws addressed exceedingly mundane and trivial matters unworthy of state legislative consideration.

As to why the people finally voted for the call of the 1890-91 Constitutional Convention, additional facts need mentioning.[15] The Third

---

[13] Prof. Ireland noted the connection between county government and special and local legislation, stating "[w]hile some argued that local legislation increased the power of the legislature over the counties, the reverse was often true[,]" since legislators were "besieged" with demands for local and special bills. Ireland, *Little Kingdoms* at 10. From this perspective, § 59 is seen more as a limitation on county and municipal government. This view makes much sense when one considers that in the Kentucky session laws from 1865 to 1890, approximately 50% of all acts related to municipal or county matters: incorporating a town or amending its charter, changing court times, adjusting court jurisdiction, authorizing issuance of bonds, providing for school matters, declaring a stream navigable, regulating fishing on a given stream, and on and on.

[14] Kermit L. Hall, *American Legal History as Science and Applied Politics*, 4 Benchmark 229, 232 (1990) (describing Prof. Hurst as the dean of American legal historians").

[15] As an aside, pontificating on the electoral motives of large number of voters would appear to be the height of judicial hubris. Over 160,000 voters in 1887 and

20

Constitution contained barriers to its alteration. Individual amendments were not permitted, and change could only be made by a constitutional convention called by the affirmative vote by a majority of all citizens entitled to vote at two successive biennial elections. Ky. Const. of 1850, Art. XII, § 1. This electoral procedure was especially onerous to satisfy, and calls failed in 1875, 1879, 1883, and 1885. The requisite majority was only obtained when the legislature provided "those who came to vote could be considered as the total entitled to vote for representatives." Hambleton Tapp & James C. Klotter, *Kentucky: Decades of Discord 1865-1890*, 259 (1977). The legislature had, thus, been trying to call a convention for 15 years, and only with legislative sleight of hand was the call able to succeed.

Next, special legislation was not the only pressing need requiring redress in the 1890-91 Constitutional Convention. Contemporary newspapers advocating an affirmative vote for the call gave several reasons: rid the 1850 constitution's references to slavery, provide a means of amendment, replace voice voting with vote by ballot, restrict municipalities and counties as to indebtedness and taxation, reform the jury system, provide term limits for officers, reform the court system, as well as limiting special and local legislation. *E.g.*, "The Constitutional Convention," *Evening Bulletin* (Maysville), July 12, 1889, at 2; "A Constitutional Convention, *Twice-A-week Messenger* (Owensboro), July 25, 1889, at 4. Contrary to the *Tabler* court's assertion as to

---

over 180,000 voters in 1889 approved the convention call. *See* "23,403 Majority: The Official Report of the Vote of the State for Calling a Constitutional Convention," *Courier-Journal* (Louisville), Aug. 22, 1887, at 5; "For the Constitution: The Results of the Election Held Last August Finally Made Known," *Courier-Journal* (Louisville), Sept. 26, 1889, at 5.

the cause of the Convention,[16] the delegates themselves also gave varied

reasons as to the primary cause: enforcement of criminal laws, Del. Thomas S.

Pettit, 1890-91 Const. Debates at 4680–81, Del. J. F. Montgomery, *id.* at 4041,

and Del. Laban T. Moore, *id.* at 4170; judicial reform, Del. Francis A. Hopkins,

*id.* at 1684; suppression of pools, trusts and combinations, Del. L. W. Lassing,

*id.* at 3784; adoption of ballot voting and aid to common schools, Del. William

Beckner, *Courier-Journal* (Louisville), June 15, 1890, at 13.

This historical digression has been necessary to demonstrate that

reasons the *Tabler* court gave for "super-charging" *Schoo*'s flawed analysis were

erroneous and ultimately misleading. Seven years after *Tabler*, the Court, in

*Perkins*, essentially doubled down on its analysis, comparing other states'

constitutions to Kentucky's and stating "[b]ut few have additional protection

against local and special legislation as we have in Kentucky Constitution § 59."

808 S.W.2d at 818. Incredibly, this statement blatantly ignored widespread

prohibition of special legislation. 1) Kentucky convention delegates freely

acknowledged copying Section 59's provisions from other state's constitutions:

Illinois, Missouri, New Jersey, New York, Pennsylvania, Texas, West Virginia,

and Wisconsin. 1890-91 Ky. Const. Debates at 3992. 2) In 1890, thirty-five

states' constitutions prohibited local and special legislation. Charles C.

Binney, *Restrictions upon Local and Special Legislation in State Constitutions*,

130–31 (1894). 3) The federal government, in 1886, had imposed similar

---

[16] In *Tabler*, Justice Leibson, writing for the majority, includes four quotations to support the narrative as to the purpose motivating the call. 704 S.W.2d at 183–84. While arguments exist that those quotations are taken out of context, suffice to note that contemporary newspaper editors and convention delegates believed the call was due to other issues.

22

restrictions on territorial governments. U.S. Stats. at Large, ch. 818, 24 Stat. 170 (1886). And 4) currently, no less than forty-six states have prohibitions on local and special legislation! Justin R. Long, "State Constitution Prohibitions on Special Laws," 60 Cleve. St. L. Rev. 719, 721 n.6 (2012).

To conclude, our obligation as judges is to uphold Kentucky's constitution. We have done so in several opinions over the last few years, even when doing so overturned established precedent. *E.g., Westerfield v. Ward*, 599 S.W.3d 738 (Ky. 2019), *reh'g denied* (Oct. 31, 2019) (rejecting proposed constitutional amendment as noncompliant with Ky. Const. §§ 256–57, implicitly overruling *Funk v Fielder*, 243 S.W.2d 474 (Ky. 1951)); *Commonwealth v. Claycomb ex rel. Claycomb*, 566 S.W.3d 202 (Ky. 2018) (holding medical review panel act violated Ky. Const. § 14); *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74 (Ky. 2018) (overturning pension bill enacted in violation of constitutional provisions); *Maupin v. Commonwealth*, 542 S.W.3d 926 (Ky. 2018) (holding Ky. Const. § 115 bars the Commonwealth from appealing a judgment of acquittal, overruling *Brindley v. Commonwealth*, 724 S.W.2d 214 (Ky. 1986)); *D & W Auto Supply*, 602 S.W.2d at 425 (overruling enrolled bill doctrine set forth in *Lafferty v. Huffman*, 99 Ky. 80, 35 S.W. 123, 126 (1896) and fifteen cases which had followed *Lafferty*). In non-constitutional cases, we have reasserted the correctness of decisions rendered decades ago, overruling more recent cases. *See Ellington v. Becraft*, 534 S.W.3d 785, 793–94 (Ky. 2017) (citing *Riley v. Buchanan*, 116 Ky. 625, 76 S.W. 527 (1903) to overturn more recent, albeit unnamed, cases concerning the establishment of public roads).

23

In this same vein, we hold that the test for claimed violations of Section 3, Kentucky's equal protection clause, is inappropriate for Section 59.[17] We therefore return to the original test for Section 59: local or special legislation, according to the well-known meaning of the words, applies exclusively to particular places or particular persons. *Singleton*, 175 S.W. at 373. In departing from more recent analysis of special legislation, we note that "cases decided contemporaneously or close in time [to the constitutional convention] would appear to be persuasive of Delegates' intent[]"). *Williams v. Wilson*, 972 S.W.2d 260, 267 (Ky. 1998). Furthermore, as to constitutional interpretation, "the meaning, purpose, and reach of the words used must be deduced from the intention they express considered in the light of the history that pertains to the subject. The terms used are to be construed according to their meaning at the time of the adoption of the Constitution." *Commonwealth v. Ky. Jockey Club*, 238 Ky. 739, 751, 38 S.W.2d 987, 992 (1931) (internal quotation and citation omitted).[18]

Some may say that with this simple test legislators will be able to draft around the Section 59 prohibition by avoiding express reference to a specific

---

[17] We importantly note that while we return to § 59's proper analysis, we do not necessarily "overrule" the results of any prior decision, except to the extent that those decisions have erroneously applied an inappropriate analysis. For example, in *Elk Horn Coal*, while the Court discussed *Tabler*, *Perkins* and other cases, the Court ultimately applied equal protection provisions under §§ 1, 2 and 3 holding that no rational basis existed for KRS 26A.300's 10% penalty against unsuccessful appellants. 163 S.W.3d at 421.

[18] The concurring opinion concludes, quoting from *Daniel's Adm'r v. Hoofnel*, 287 Ky. 834, 839, 155 S.W.2d 469, 472 (1941), by criticizing that we are departing from an interpretation consistently adhered to. Far from being consistent, as shown herein, this Court has inconsistently analyzed the prohibition of § 59 and conflated that analysis with that of § 3. No good reason exists for perpetuating this error, especially in this case wherein this Court unanimously agrees on the result.

24

person, entity or locale but articulating criteria for a statute's application that as a practical matter only a specific person, entity or locale can satisfy, essentially reverting to the ways of the 1870s and 1880s.[19]  The answer to this objection is that Kentucky's courts, in that pre-1891 Constitution period, had only just begun to apply the "exclusive, separate" privilege prohibition of the Bill of Rights to evaluate class or partial legislation, and to equate that section with equal protection.  Over the last 130 years, courts have had experience with the analysis and have shown little hesitancy in engaging a more rigorous analysis with respect to classification legislation.

To summarize, and for the sake of clarity going forward, state constitutional challenges to legislation based on classification succeed or fail on the basis of equal protection analysis under Sections 1, 2, and 3 of the Kentucky Constitution.  As for analysis under Sections 59 and 60, the appropriate test is whether the statute applies to a particular individual, object or locale.

Applying the correct test, we hold that KRS 342.750(6) does not violate Sections 59 and 60 for the simple reason that the statute does not apply to a

---

[19] While the legislature has generally adhered to the prohibition as originally understood, on occasion it has enacted special legislation, which the Court held to violate § 59. *See Univ. of Cumberlands v. Pennybacker*, 308 S.W.3d 668 (Ky. 2010) (act to create a scholarship program which had clearly been drafted to provide scholarships to an equally unconstitutionally funded pharmacy school at a private, religious university; the Court applied the *Schoo* test but reached correct result since the statute applied to particular object); *Commonwealth, Dep't of Highways v. McCoun*, 313 S.W.2d 585 (Ky. 1958) (joint resolution authorizing two named individuals to pursue claims against the Department of Highways); *Dep't of Conservation v. Sowders*, 244 S.W.2d 464 (1951) (resolution authorizing designated family to file for and receive workers' compensation benefits); *Bentley v. Commonwealth*, 239 S.W.2d 991 (Ky. 1951) (resolution authorizing individual to engage in the practice of dentistry); *Reid v. Robertson*, 304 Ky. 509, 510, 200 S.W.2d 900, 901 (1947) (act to provide individual a veterinary medicine license).

particular individual, object or locale. It applies statewide to all employers and employees.

## IV.    CONCLUSION.

For the reasons set forth above, the decision of the Court of Appeals is hereby affirmed, and this matter is therefore remanded to the ALJ for a determination of whether Woodall is eligible for an award of benefits pursuant to KRS 342.750(1)(a).

All sitting. Minton, C.J.; Hughes, Lambert and Nickell, JJ., concur. Keller, J., concurs in part and concurs in result only by separate opinion in which Wright, J., joins.

KELLER, J., CONCURRING IN PART AND CONCURRING IN RESULT ONLY IN PART: I concur fully with the majority's analysis and holdings regarding Ms. Woodall's income benefits under KRS 342.750(1)(a) and the estate's equal protection claim as to lump-sum benefits under KRS 342.750(6). I concur in result only as to the estate's special legislation claim regarding the lump-sum benefits and write separately to register my strong disapproval of the majority's decision to purge sixty-five years of our jurisprudence in this area. Kentucky's prohibition against special legislation prohibits "legislation which arbitrarily or beyond reasonable justification discriminates against some persons or objects and favors others."[20] The facts of the current case are not particularly enlightening to a debate on special legislation jurisprudence or particularly relevant to its conclusion. For this reason, I will omit restating the

---

[20] *Johnson v. Gans Furniture Indust., Inc.*, 114 S.W.3d 850, 856 (Ky. 2003) (quoting *Bd. of Ed. of Jefferson Cnty. v. Bd. of Ed. of Louisville*, 472 S.W.2d 496, 498 (Ky. 1971)) (internal quotation marks omitted).

facts outlined by the majority. Instead, I turn to this Court's analysis of special legislation, specifically our application of the *Schoo*[21] test versus the majority's new, "original test." In doing so, I begin with a brief background of sections 59 and 60 of the Kentucky Constitution.

## A. Background of section 59 and section 60 of Kentucky Constitution

Lawmakers at the 1890-91 Constitutional Convention in Kentucky were concerned not just with special laws being enacted for railroad companies, but with laws enacted specifically for any particular industry, corporation, or locality.

> The universal disapproval of every person in Kentucky suggested sharp and effective remedies for the evils of such a system of law-making. Outside of all questions of economy the demoralization of the Legislature, the inequality of laws so passed had produced the grossest of wrongs, and the demand for a change on this subject was absolute and universal.[22]

"Unbridled legislative power had become the captive of special interest groups. Concern for limiting the powers of the legislature in general, and with cutting off special and local legislation in particular, was the primary motivating force behind enactment of the new Kentucky Constitution of 1891."[23]

Section 59 prohibits the General Assembly from passing "local or special acts" concerning twenty-eight specific subjects. It then includes a catch-all provision that states, "[i]n all other cases where a general law can be made

---

[21] *Schoo v. Rose*, 270 S.W.2d 940 (Ky. 1954).

[22] 1890 KY. CONST. DEBATES, at 5566-67.

[23] *Tabler v. Wallace*, 704 S.W.2d 179, 184 (Ky. 1985).

27

applicable, no special law shall be enacted."[24] "[T]he primary purpose of section 59 was to prevent special privileges for those with wealth and power sufficient to sway the Assembly and to ensure equality under the law."[25]

In discussing section 60, which also deals with special legislation, the following statements were recorded: "Therefore, that, whilst the law was uniform and general in its provisions, it was not uniform and general in its operation, but was special and local in its operation, dependent entirely upon the will of a particular locality."[26] "The very definition of a general law is that it must be uniform."[27] Legislators were concerned with all special legislation, **not only in its written form, but also in its application**.

While common sense dictates that the legislature is not forbidden from passing laws dealing with areas of economic, social or criminal concern, sections 59 and 60 require courts to analyze such legislative actions when undue privilege or discrimination is alleged. Such scrutiny begins by looking at the plain language of the applicable provisions, but it does not end there. Courts must also look beyond the plain language to determine if the provisions fail to operate uniformly.[28]

In general, special legislation "does not have a uniform operation," rather it relates to particular persons, entities or things "either...by the express terms of the act or separated by any method of selection from the whole class to

---

[24] KY. CONST. § 59.

[25] *White v. Manchester Enter., Inc.*, 910 F.Supp. 311, 314 (E.D. Ky. 1996).

[26] 1890 KY. CONST. DEBATES, at 5762.

[27] 1890 KY. CONST. DEBATES, at 5762.

[28] *Zuckerman v. Bevin*, 565 S.W.3d 580, 612 (Ky. 2018) (Keller, J., dissenting).

28

which the law might, but for such limitations, be applicable."[29] This includes statutes that

> are not general in their application to the class to which they apply, do not bring within their limits all those who are in substantially the same situation or circumstances, or who stand upon the same footing regarding the subject of the legislation, but which, to the contrary, discriminate between persons of the same class doing the same act.[30]

We have consistently held the fundamental purpose of section 59 is to "prevent special privileges, favoritism, and discrimination, and to [e]nsure equality under the law."[31] Sections 59 and 60 prevent the enactment of laws that do not "operate alike on all individuals and corporations."[32]

## B. The *Schoo* Test

Our modern test for determining whether a law survives a special legislation challenge was first formulated in *Schoo v. Rose*.[33] In *Schoo*, the Court analyzed a statute that exempted carriers whose vehicles were designed to carry more than nine people from the requirement that they submit evidence they had paid their personal property taxes before being issued a vehicle registration receipt.[34] We held that the statute was an unconstitutional violation of the Kentucky Constitution's prohibition on special legislation.[35] In doing so, we set out what has now become known as the *Schoo* test. The *Schoo*

---

[29] *Reid v. Robertson*, 200 S.W.2d 900, 903 (Ky. 1947).

[30] *Id.*

[31] *Jefferson Cnty. Police Merit Bd. v. Bilyeu*, 634 S.W.2d 414, 416 (Ky. 1982) (citing *City of Louisville v. Kuntz*, 47 S.W. 592, 592-93 (1898)).

[32] *Id.*

[33] 270 S.W.2d 940.

[34] *Id.* at 941.

[35] *Id.* at 942.

test states, "[I]n order for a law to be general in its constitutional sense it must meet the following requirements: (1) It must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification."[36]

This Court provided additional clarification to the *Schoo* test in *Yeoman v. Commonwealth, Health Policy Board*.[37] In *Yeoman*, a group of doctors sued to invalidate healthcare reforms passed by the General Assembly in 1994.[38] Among their claims were two violations of section 59.[39] The first was that a private foundation would benefit from the passage of the legislation through the governor's promise to consult with it as to the appointment of certain government officials in return for the foundation's support of the bill's passage.[40] The second, more direct, section 59 claim dealt with the classification of healthcare providers into eight categories resulting in disparate tax treatment which Yeoman asserted was irrational and arbitrary.[41]

In discussing special legislation, we stated, "[s]pecial legislation, as defined by [section] 59, is not legislation which is merely designed to further a specific purpose;" rather, it is "that which favors a special interest to the detriment of the rest of society."[42] When performing an analysis under *Schoo*, the Court said:

---

[36] *Id.* at 941 (citations omitted).

[37] 983 S.W.2d 459 (Ky. 1998).

[38] *Id.* at 463.

[39] *Id.*

[40] *Id.* at 466.

[41] *Id.* at 468.

[42] *Id.*

determining whether the first prong of the test is satisfied should be a fairly straightforward matter. Either the laws do apply to everyone in a class equally or they do not. However, deciding whether the classification itself is valid can be substantially more complex. This Court will not permit a statute to survive by simply defining a class in a narrow fashion which will yield, ipso facto, a self-sustaining classification.[43]

As to the claim regarding the foundation, nowhere in the bill was there a provision for the foundation's direct power of appointment in return for its support of the bill's passage; rather, any such power was the result of promises by the governor to consult with the foundation on such appointments.[44] The Court said, while perhaps improper, nothing in the governor's promise impermissibly favored the foundation by the bill's passage.[45]

As to the classification of healthcare taxes, "[w]hen asserting the validity of a classification, the burden is on the party claiming the validity of the classification to show that there is a valid nexus between the classification and the purpose for which the statute in question was drafted."[46] "There must be substantially more than merely a theoretical basis for a distinction. Rather, there must be a firm basis in reality."[47] We held that the division of healthcare providers into eight classes was constitutional, as the statute's classification was the antithesis of arbitrary.[48] In that case, the class distinctions were

---

[43] *Id.* (citing *Kentucky Harlan Coal Co. v. Holmes*, 872 S.W.2d 446 (Ky. 1994) (Stephens, C.J., dissenting) (4–3 decision)).

[44] *Id.* at fn 7.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.* at 469.

31

precisely the same distinctions enumerated in federal law and were required as part of the state's program in order to receive federal matching funds.[49]

## C. Recent Special Legislation Jurisprudence

In *University of the Cumberlands v. Pennybacker*,[50] the legislature enacted a statute that provided scholarships for pharmacy students who were enrolled or accepted for enrollment in an accredited Kentucky pharmacy school with its main campus located in an Appalachian Regional Commission county and who would serve in Kentucky.[51] Subsection 3 of the statute provided the specific qualifications for the scholarship. The recipient was required to: (a) be a Kentucky resident and United States citizen; (b) be enrolled in or accepted to a full-time pharmacy program in the Commonwealth; (c) serve one year as a pharmacist in Kentucky for each year he or she received scholarship money; and (4) sign a promissory note to repay the scholarship award if service was not completed.[52] Subsection 4 went on to define the scholarship value as the difference between the recipient's actual tuition cost and the cost of in-state tuition at the University of Kentucky College of Pharmacy.[53]

Although the requirements associated with the scholarship appeared to be non-discriminatory and rationally related to a need for pharmacists in the Appalachian region of Kentucky, "the sole institution which would fit that description is [University of the Cumberlands], providing the Pharmacy School

---

[49] *Id.*

[50] 308 S.W.3d 668 (Ky. 2010).

[51] *Id.* at 685.

[52] *Id.* at 683.

[53] *Id.*

is built."[54] This Court held that in setting these requirements, the legislature did not treat all in the class equally.[55] The class addressed by the statute "is that class of students 'who are enrolled or accepted for enrollment' in a Kentucky pharmacy school and who will serve in Kentucky."[56] The arbitrary treatment is only apparent in the operation of the statute when statutory requirements are read in concert with each other and could only be satisfied by students attending the College of Pharmacy at the University of the Cumberlands.[57] No student enrolled in Kentucky's remaining pharmacy program, University of Kentucky College of Pharmacy, could ever receive value from the scholarship.[58] Students meeting the subsection 3 requirements would already be paying the in-state tuition amount which was the basis for determining the scholarship's value.[59] As such, "the inescapable conclusion is that the Pharmacy Scholarship Program was intended only for students attending the anticipated [University of the Cumberlands] Pharmacy School."[60] We held that the General Assembly's failure to treat equally all members of the pharmacy student class was "precisely the type of special privilege and favoritism that section 59 condemns."[61]

---

[54] *Id.*
[55] *Id.* at 685.
[56] *Id.*
[57] *Id.* at 684.
[58] *Id.* at 683.
[59] *Id.*
[60] *Id.* at 684.
[61] *Id.* at 685.

More recently we addressed the application of section 59 to Kentucky law in *Zuckerman v. Bevin*.[62] In *Zuckerman*, the majority utilized the *Schoo* test to uphold Kentucky's recently enacted right-to-work statute, finding no violation of our prohibition against special legislation.[63] I dissented, joined by two others, because I would have found, also utilizing the *Schoo* test, that the statute violated section 59 as special legislation.[64] A separate concurring opinion questioned whether *Schoo* adequately addressed the purposes of sections 59 and 60, but despite these questions the author fully joined and concurred with the majority.[65] In response to the concurring opinion, I emphasized then, as I do now, the importance of stare decisis in our jurisprudence.[66] Today's majority takes the opportunity to dismantle our long-standing test for special legislation in a case where this significant change in the law has no effect on the outcome of the matter before us. More importantly, nearly two years ago, in *Zuckerman*, the majority rejected taking this step.

## D. Application to KRS 342.750(6)

In the present case, Woodall argues that the time restriction in KRS 342.750(6) treats the estates of injured workers who die more than four years after their injuries differently than it treats the estates of workers who die within four years after their injuries, without a rational basis for doing so. Woodall further argues that the time limitation in KRS 342.750(6)

---

[62] 565 S.W.3d 580.

[63] *Id.* at 600.

[64] *Id.* at 613 (Keller, J., dissenting).

[65] *Id.* at 606 (Minton, C.J., concurring).

[66] *Id.* at 616 (Keller, J., dissenting).

34

distinguishes between the estates of injured workers based only on time—i.e., how much time has passed between the work-related injury and the injury-related death—and that such classification is not rational. When we have previously considered statutes of repose such as this one, they have only been held unconstitutional to the extent that they effectively abolish a common law right.[67] When considering limits on legislative-created rights, we have considered such statutes to be constitutional.[68] These holdings principally dealt with challenges as to the application of sections 14, 54, and 241 of our constitution, but were silent as to section 59's special legislation prohibition.

Analyzing the statute through the lens of *Schoo*, like the majority, I find the limitation is not a violation of section 59 of the Kentucky Constitution. Contrary to Woodall's argument, the statute does not favor any one group over another. The four-year distinction applies equally to all injured workers who die as a result of their injuries. The legislature had substantial and justifiable reasons supporting this classification, and the classifications were distinctive and natural based on the legitimate purpose. First, we note that "'[r]epose' means 'rest,' and the philosophical foundation of statutes of repose is that after so long a period, a defendant has a right to no longer be exposed to the potential of a lawsuit, even if the plaintiff does not discover the injury until long after the event."[69]

---

[67] *See, e.g., Saylor v. Hall*, 497 S.W.2d 218, 225 (Ky. 1973) (holding that statute of repose in KRS 413.135 violates sections 14, 54, and 241 of the Kentucky Constitution).

[68] *See Wright v. Oberle-Jordre Co., Inc.*, 910 S.W.2d 241, 243 (Ky. 1995).

[69] 13 Ky. Prac. Tort Law § 10:43 (2019 ed.).

Similarly, the purported purpose of the time limitation in KRS 342.750(6) is to provide employers with a cut-off date after which they are no longer liable for the lump-sum amount. To achieve this purpose, KRS 342.750(6) distinguishes between the estates of injured workers based on time—i.e., how much time has passed between the work-related injury and the event triggering an estate's ability to obtain the lump-sum benefit, namely, the injury-related death. Stated another way, the time limitation in KRS 342.750(6) provides a cut-off date to relieve employers of an ongoing obligation to pay the lump-sum benefit.

Accordingly, the statute's classification, based only on the time between injury and death, is reasonably related to the purpose of the time limitation. Here, I am similarly persuaded that employers are entitled to rely on the repose provision of KRS 342.750(5). That provision ensures that, if more than four years have passed from the date of the workers' injury, the employer will not be responsible for providing a lump-sum death benefit, thereby "freeing them from any liability for compensation after the passage of" the repose period.[70]

**E. Majority's Historical Digression**

While I agree with the majority that KRS 342.750(6) does not violate section 59, the majority has taken the opportunity to reinvent our test for what constitutes such a violation. In support, the majority harkens us back to a bygone era where the jurists articulating the tests were closer in time to the adoption of our 1891 Constitution. The majority holds the "original test" for special and local legislation was articulated in *Greene v. Caldwell* and hinges

---

[70] *Wright*, 910 S.W.2d at 245.

36

on whether the subject legislation applied to particular places or persons as distinguished from classes of places or persons.[71] In addition to *Greene*, the majority relies on *Singleton v. Commonwealth*[72] and *Commonwealth v. E. H. Taylor, Jr. Co.*[73] *Greene* dealt with legislative modifications to Kentucky's worker's compensation laws, as does this case.[74] We stated that legislation identifying responsibilities for employers and insurance companies regarding worker's compensation were reasonable classifications and as "just as practicable."[75]

*Singleton* dealt with a car thief's attempt to have the general auto theft statute found unconstitutional because it dealt with a particular crime.[76] We stated that a generally applicable criminal statute did not fail as special legislation simply because it dealt with a specific offense.[77] Lastly in *Taylor*, we held that a whiskey tax did not constitute special legislation because "it cannot be contended that this law applies alone to the distiller, or to Franklin County, or to the Seventh congressional district. It operates upon a multitude of property of like character, owned by persons all over the state, and...is neither local nor special, but general."[78]

---

[71] 186 S.W. 648, 654 (Ky. 1916).

[72] 175 S.W. 372, 373 (Ky. 1915) (holding "local or special legislation, according to the well known meaning of the words, applies exclusively to special or particular places, or special and particular persons, and is distinguished from a statute intended to be general in its operation and that relating to classes of persons or subjects[]").

[73] 41 S.W. 11 (Ky 1897).

[74] 186 S.W. at 649.

[75] *Id.* at 654.

[76] 175 S.W. 372, 373 (Ky. 1915).

[77] *Id.*

[78] *Taylor*, 41 S.W at 15.

The majority posits that *Schoo*'s foundation is more firmly based in equal protection analysis than in special legislation analysis under *Safety Building Loan Co. v. Ecklar*.[79] In *Ecklar*, a homeowner was arguing that statutes permitting building and loan associations to charge a different, higher interest rate than those charged by bank corporations was unconstitutional.[80] Statutes permitting the building and loan associations to charge rates differently were based on the classification of such institutions as largely private, member-funded associations.[81] Recent statutory changes permitted building and loan associations to operate in ways more consistent with bank corporations.[82] We held in *Ecklar* that the statutory changes had destroyed the natural "distinctive marks which characterized building and loan associations" and doing so resulted in conferring "special privileges."[83]

In reading *Ecklar*, we admittedly failed to make clear upon which constitutional provisions we based the holding. The majority rightly points to one of the key quotations from *Ecklar* dealing with classification, but fails to address *Ecklar's* following sentence that "[a] law does not escape the constitutional inhibition **against being a special law** merely because it applies to all of a class arbitrarily and unreasonably defined."[84] While the present Court may be unclear as to whether *Ecklar's* holding was based on section 59,

---

[79] 50 S.W. 50 (Ky. 1899), *overruled in part by Linton v. Fulton Bldg. & Loan Ass'n*, 90 S.W.2d 22 (Ky. 1936).

[80] *Id.*

[81] *Id.*

[82] *Id.* at 51.

[83] *Id.* at 52.

[84] *Id.* at 51. (emphasis added)

38

our predecessor court was not so unclear in *Linton v. Fulton Building & Loan Association*.[85] In *Linton*, a court much closer in time to *Ecklar* explicitly overruled *Ecklar* based on its reading of section 59, holding building and loan associations represented a natural classification and a proper subject of independent legislation.[86]

We decided other cases contemporaneously with *Greene*, each indicating the need of the court to review appropriate classifications for purposes of section 59. In *Smith v. Board of Trustees of Shelby Graded School District*, we said that whether a law is special or general is a question of whether "its terms are applicable to all of the objects or things composing the class of objects or things to which the act relates, provided the classification of such objects and things **are not unreasonably and arbitrarily made**."[87] In *Droege v. McInerney*, we stated that "[a] law does not escape the constitutional inhibition against being a special law merely because it applies to all of a class arbitrarily and unreasonably defined."[88] The majority argues *Droege* is more properly read as an interpretation of section 156, but I take the *Droege* court at its word that it was interpreting section 59.[89] "Perhaps no single principle of the law is more

---

[85] 90 S.W.2d 22 (Ky. 1936).

[86] *Id.* at 25.

[87] *Smith v. Bd. of Trustees of Shelby Graded School Dist.*, 186 S.W. 927, 930 (Ky. 1916) (holding the classification was not unreasonable or arbitrary and applying to all of the places or objects of the same class throughout the state). (emphasis added)

[88] 87 S.W. 1085, 1085 (Ky. 1905); *see also Burrow v. Kapfhammer*, 145 S.W.2d 1067, 1071 (Ky. 1940) ("In view of the constant effort of classes and political blocs to obtain special privileges from the government, there is constant danger that the doctrine of classification may be carried so far as practically to nullify the constitutional provisions.") (citing *Fisher v. Grieb*, 113 S.W.2d 1139 (Ky. 1938) (internal quotation marks omitted)).

[89] *Id.* at 1085.

39

firmly settled by the unanimous declaration of courts and text writers than (a) that it is competent for legislatures to classify subjects for legislation, provided (b) the classification is based upon reasonable grounds and is not arbitrary."[90] Even *Greene* implicitly acknowledges the requirement that the judiciary undertake an assessment of the class upon which a statute operates and determine whether such classification was "as reasonable and just as practicable as conditions will permit[.]"[91] While not a word for word paraphrase of *Schoo*, the underlying principles are unmistakable.

The majority puts great weight on our words from *Tabler* identifying anti-railroad sentiment as the catalyst for the adoption of section 59. *Tabler* illustrates their thesis of a transition from the more focused, objective examination of special legislation claims to one that, in the majority's estimation, is a more flexible and subjective equal protection-based examination. The majority goes on to argue convincingly, and I agree rightly, that the anti-railroad sentiment outlined in *Tabler* was only one likely catalyst for the adoption of section 59, and that equally important were concerns that individual legislators were inappropriately advancing bills with narrow, or even individual effect. By viewing the constitutional background through this prism, the majority advances that *Schoo* places too little weight on individualized analysis and too great a weight on class analysis that is better undertaken though a section 3 equal protection framework. The majority asserts that the shift permits too much discretion on the part of jurists because "[n]o one

---

[90] *Burrow v. Kapfhammer*, 145 S.W.2d 1067, 1070 (Ky. 1940).

[91] 186 S.W. 648, 654 (Ky. 1916).

40

knows or can possibly know when a given statute will strike any judge, or four justices of this court, as worthy of the heightened standard."

**F. The majority's test is no more objective than *Schoo's* test.**

To combat the subjective nature the majority sees in *Schoo*, it advances an "original test" for section 59, but I fail to find a test in the majority's opinion capable of being implemented by our trial courts. It advances *Singleton's* interpretation of special legislation as applying the "well-known meaning of words, appl[ying] exclusively to particular places or persons."[92] The majority seemingly focuses on whether the trial court reading the legislation can identify with particularity persons or places benefiting or suffering by the legislation's terms. The majority, however, fails to identify an applicable standard by which a trial court can identify at what point "particular places or persons" become "classes of places or persons," seemingly adopting Justice Stewart's test from *Jacobellis v. Ohio*, "I know it when I see it."[93] I find such a test even more subjective than the concerns the majority has regarding *Schoo*.

Using the majority's test likely brings us to much the same conclusion in our recent cases of *Pennybacker* and *Zuckerman*. The former would be unconstitutional on its face, while the later would survive as a regulation of class under a rational basis review. But what about a case like *Klein v. City of Louisville*?[94] In *Klein*, the General Assembly passed a statute permitting first class cities to construct interstate bridges and fund the construction through

---

[92] *Singleton v. Commonwealth*, 175 S.W. 372, 373 (Ky. 1915).

[93] 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

[94] 6 S.W.2d 1104 (Ky. 1928).

41

bond issues and tolls.[95] At the time of its passage only one city, Louisville, met the size requirement and was situated in a location where building an interstate bridge was feasible.[96] Like *Pennybacker*, on its face the statute dealt with a "particular place," indeed one so particular that only one existed. We held that the law was not special, but general, even though only one city could take advantage of the legislation.[97] We said the law was general because it applied to "all cities of the same class," other cities may grow to become members of the first class, and restricting the law to first class cities was natural and reasonable because it was impracticable for smaller cities to construct and maintain such bridges.[98] Under the majority's test, this statute likely would have been held to be an unconstitutional violation of section 59.

The majority assures us that implementing its new rule is unlikely to result in legislative attempts to circumvent the test and that section 59's prohibitions will catch the most obvious attempts.[99] Furthermore, even should such legislation survive the initial section 59 inquiry, the majority asserts that the "exclusive, separate privilege" prohibition of section 3 prevents such abuse. But analyzing such abuses, absent the implication of a fundamental right, suspect class or other classification subject to higher scrutiny, equal protection

---

[95] *Id.* at 1105.

[96] *Id.* at 1107.

[97] *Id.*

[98] *Id.*

[99] The majority in its footnote 18 states the legislature has generally adhered to section 59's prohibition and the court has prevented specific transgressions utilizing a similar original review. *See Pennybacker*, 308 S.W.3d 668 (Ky. 2010); *Commonwealth Dep't of Highways v. McCoun*, 313 S.W.2d 585 (Ky. 1958); *Dep't of Conservation v. Sowders*, 244 S.W.2d 464 (Ky. 1951); *Bentley v. Commonwealth*, 239 S.W.2d 991 (Ky. 1951); *Reid, v. Robinson*, 200 S.W.2d 900 (Ky. 1947).

42

issues are evaluated under a rational basis review.[100] Such legislation survives if it can be shown to further a legitimate state interest, and that there is a **conceivable basis** for the classes it creates.[101] If that were not enough, the evidentiary burden in a rational basis review requires the challenger to demonstrate that no rational basis exists for the classification.[102] Our precedent regarding section 59 places on the proponent of the classification, usually the Commonwealth, the burden of establishing that the classification was not arbitrary or unreasonable.[103] The profound effect of this reversal in burden is difficult to overestimate.

## G. The reevaluation of Constitutional jurisprudence should be done when facts and circumstances make such differences meaningful.

Our jurisprudence regarding sections 59 and 60 is unique to the Commonwealth. "It is the distinguished role of this Court throughout the ages to be a stabilizing force, standing apart from the political headwinds which sweep through the legislative process."[104] We have emphatically stated "stare decisis [is] the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion."[105] Unlike

---

[100] *See Mobley v. Armstrong*, 978 S.W.2d 307 (Ky. 1998) (Rational basis analysis is used when an equal protection claim does not involve a suspect class such as race or gender or interfere with a fundamental right such as the right to privacy or the right to vote).

[101] *Keith v. Hopple Plastics*, 178 S.W.3d 463, 466 (Ky. 2005).

[102] *Hodge v. Commonwealth*, 116 S.W.3d 463 (Ky. 2003); *see also Commonwealth v. Howard*, 969 S.W.2d 700 (Ky. 1998); *Innes v. Howell Corp.*, 76 F.3d 702 (6th Cir. 1996).

[103] *Yeoman v. Com., Health Policy Bd.*, 983 S.W.2d 459, 468 (Ky. 1998).

[104] *Zuckerman*, 565 S.W.3d at 619 (Ky. 2018) (Wright, J., dissenting).

[105] *Chestnut v. Commonwealth*, 250 S.W.3d 288, 295 (Ky. 2008) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 265–265 (1986)).

some jurisdictions, stare decisis has real meaning to this Court."[106]

Furthermore:

> [r]egardless of what the views of the Court as now constituted may be as to the soundness of the construction originally given the Constitution ... we are of the opinion that the construction should be adhered to under the doctrine of stare decisis.... And since it is of the utmost importance that the organic law be of certain meaning and fixed interpretation, decisions construing a constitution should be followed in the absence of strong reasons for changing them.[107]

Admittedly, stare decisis is not involatile or inflexible and it does not require the perpetuation of error or logic. I agree with the majority that rules may be revisited and revised, but such revisions should be only upon sound factual grounds. Revisiting such precedents should only be undertaken where such rules have shown themselves to be "unworkable or badly reasoned."[108] As we stated in *Daniel's Administrator v. Hoofnel*,

> The force of the rule depends upon the nature of the question to be decided and the extent of the disturbance of rights and practices which a change in the interpretation of the law or the course of judicial opinions may create. Cogent considerations are whether there is **clear error and urgent reasons 'for neither justice nor wisdom requires a court to go from one doubtful rule to another,'** and whether or not the evils of the principle that has been followed will be more injurious than can possibly result from a change.[109]

Nothing in the present case illustrates an urgent need to move from one rule of law to another. The *Schoo* test appropriately categorizes the facts of this case and leads to the same result the majority advances. As we stated in 1941,

---

[106] *Zuckerman*, 565 S.W.3d at 616 (Minton, C.J. concurring) (citing *Yeoman*, 983 S.W.2d at 469).

[107] *Id.*

[108] *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

[109] 155 S.W.2d 469, 471-72 (Ky. 1941) (emphasis added).

44

absent a constitutional amendment, "to change the interpretation of the present constitution which has been consistently adhered to ..., would be to upset governmental policy followed since the foundation of the Commonwealth 150 years ago."[110] If we are to throw sixty-five years of our judicial philosophy to the wind, let us at least do so in a case where such differences in analysis matter to the outcome of the litigation before us.

Wright, J., joins.

COUNSEL FOR APPELLANT/CROSS-APPELLEE, CALLOWAY COUNTY SHERIFF'S DEPARTMENT:

John Christopher Hopgood
Dorsey, Gray, Norment & Hopgood

COUNSEL FOR APPELLEES/CROSS-APPELLANTS, KAREN WOODALL, SPOUSE OF STEVEN R. SPILLMAN, DECEASED AND ESTATE OF STEVEN R. SPILLMAN BY AND THROUGH CO-ADMINISTRATORS, KAREN WOODALL AND JENNIFER NELSON:

Jeffery Roberts
Roberts Law Office

Michael M. Pitman
Haverstock, Bell & Pitman, LLP

COUNSEL FOR APPELLEE, STEPHANIE L. KINNEY, ADMINISTRATIVE LAW JUDGE:

Stephanie Letitia Kinney

COUNSEL FOR APPELLEE, WORKERS' COMPENSATION BOARD:

Michael W. Alvey

COUNSEL FOR APPELLEE, DANIEL CAMERON, ATTORNEY GENERAL:

Daniel Jay Cameron

---

[110] *Id.* at 472.